**In re SEALED CASE NO. 99–3096 (BRADY OBLIGATIONS).**

No. 99–3096.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 1, 1998.

Decided July 21, 1999.

888

Evelina J. Norwinski, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was A.J. Kramer, Federal Public Defender. Reita P. Pendry, Chief Assistant Federal Public Defender, entered an appearance.

Chrisellen R. Kolb, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, and John R. Fisher, Assistant U.S. Attorney.

Before: EDWARDS, Chief Judge, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

The defendant in this criminal case contends that the government improperly denied his repeated requests for information to which he was entitled under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government responds that because the information, if it exists, would relate to the impeachment of a defense witness, it falls outside the obligations imposed by *Brady.* Defendant replies that impeachment information always comes within the ambit of *Brady,* regardless whether the witness testifies for the defense or the prosecution.

We need not accept either of these broad claims to resolve this case. The information defendant seeks would not merely be impeaching in the sense that it would weaken the credibility of his own witness. Rather, it would be exculpatory in the sense that it would be affirmatively favorable to his assertion of innocence. Accordingly, such information comes within the scope of the government's *Brady* obligations. Because the government concedes that it has not searched to determine whether the requested information exists, we grant the defendant's request that the case be remanded to the district court. The government must first search to determine whether the information sought by defendant exists and, if it does, the district court must then determine whether that information is "material" within the meaning of *Brady* and its progeny.

## I

In September 1996, an officer of the District of Columbia's Metropolitan Police Department (MPD) applied for a warrant to search the home of John Doe[1] for a handgun and ammunition. The officer submitted an affidavit stating that an unidentified informant had observed the gun and ammunition there within the last 48 hours. The affidavit continued: "The source that provided this information has ... given information which has led to the arrests of several subjects for narcotics violations, the recovery of one assault weapon, the arrests of subjects wanted on warrants and the issuance of two search warrants." Def.App. 11. A judge of the Superior Court of the District of Columbia granted the application.

The police executed the warrant the following morning. The officers found one semi-automatic handgun under the mattress in Doe's basement bedroom, and a second gun, along with ammunition, in a shoebox under the basement stairwell. Doe was arrested and questioned. He denied the guns were his, and denied knowing that they were in the house. He said he had seen one of the guns in the possession of a friend, Thomas Jones, a couple of days earlier. Def.App., Tab A at 51. Doe's girlfriend later testified that Doe and Jones had picked her up at the hospital the day before the search, and that after returning to Doe's house, Jones had spent some time in the basement alone. *Id.*, Tab D at 29–30.

Doe was charged with unlawful possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g). In a pretrial motion filed in October 1996, Doe sought disclosure of the identity of the government's informant. Pursuant to *Brady,* he also sought production of information concerning, *inter alia*: (1) "the amount of money ... paid to the source," and whether it was "paid in exchange for information or otherwise"; (2) "other consideration provided to the source, including ... assistance in avoiding or minimizing harm from pending or threatened charges"; (3) "all benefits, promises of benefits, or statements that the source would not benefit absent cooperation ... in connection with this case"; (4) "the nature of assistance that the source has provided in the past"; and (5) "the source's prior record, pending cases, and parole and probation status." Def. App. 21. The court denied the request, ruling that defendant had not met the burden for piercing the government's informant privilege set forth in *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), because "it is basically a position of speculation as to how the informer in this case might be helpful to the defendant ... as [the case] stands before the Court now...." Def.App., Tab A at 83.

Shortly before Doe's trial was scheduled to begin, Thomas Jones called Doe's attorney, told her that he had helpful informa-

---

1. Because this case remains under seal, the names of the defendant and the informant have been changed.

tion, and asked to meet with her. In January 1997, the attorney, her investigator, and Jones met in a restaurant parking lot. According to the investigator's file memorandum, Jones told them that he was the government informant in Doe's case and that "he wanted to clear his conscience." Def.App. 29. He said that "he had a big gun and drug case in [District of Columbia] Superior Court and he had to work it off," and identified three detectives with whom he was cooperating. Jones said the guns found in Doe's apartment were his (Jones'). He said that the day before the execution of the search warrant, he and Doe had gone to pick up Doe's girlfriend at the hospital. When they returned to the house, Jones continued, he "hid the guns, one under the mattress and one in a box under the stairs." He did not tell Doe he was hiding the guns, and Doe did not know what he had done. Jones assured Doe's attorney that he would testify at Doe's trial. At the same time, he asked for assistance with his own legal problems: there was an outstanding bench warrant for his arrest, and Jones feared that the police would incarcerate him at the District of Columbia's correctional facility at Lorton, Virginia. "I can't go back to Lorton," he said, "because I snitched on so many people." *Id.*

Doe's trial began a week later. In her opening statement, Doe's attorney told the jury the evidence would show that Doe was innocent, and that Jones had planted the guns and ammunition in the house without Doe's knowledge. Def.App., Tab C at 12. Thereafter, Doe's attorney learned from the attorney in Jones' Superior Court case that Jones intended to invoke his Fifth Amendment privilege against self-incrimination and would refuse to testify at Doe's trial. The next morning, Doe's attorney advised the court that, in order to get Jones' prior statements before the jury, she planned to introduce them through the testimony of her investigator as statements against Jones' penal interest, *see* FED.R.EVID. 804(b)(3). Def. App., Tab D at 3–4.

At this point, the prosecutor questioned whether Jones really did have a Fifth Amendment privilege. After the court appointed a lawyer to advise Jones, Jones formally asserted his right not to testify. The prosecutor then asked "to speak with [Jones' lawyer] over the luncheon recess to see if we can reach some sort of accommodation ... which would permit him [Jones] to testify." *Id.* at 68, 77 S.Ct. 623. Doe's counsel then made a *Brady* request for Jones' "agreements with the government" in what she understood to be his "sealed" cases in Superior Court. *Id.* The prosecutor protested that "I don't have access to that information readily. I would have to go back to my office and try to pull out the old files and everything else." *Id.* The district court denied Doe's request as "premature," indicating that it did not want to decide the issue until it was determined that Jones would testify. *Id.* at 68–69, 77 S.Ct. 623.

After the luncheon recess, Jones agreed to testify and the government advised the court that it had agreed to make arrangements for his safety. Suspecting that Jones had become an adverse witness during the break, defense counsel again requested production of Jones' "prior agreements with the government" and "sealed" case records. The court again put off decision, this time indicating it would not consider the issue until after Jones testified. Def.App., Tab E at 11.

Jones was then called to the witness stand by Doe's counsel. Although he denied that he had told her the names of police officers with whom he was cooperating or that he was "working off" a conviction in Superior Court, *id.* at 22, 27, Jones admitted that he had told her he was the confidential informant in Doe's case, *id.* at 19. He also admitted to confessing that, while he was alone in the basement, he had planted the guns under the mattress and stairwell without Doe's knowledge. *Id.* at 19–21.

On cross-examination by the prosecutor, Jones' story changed dramatically. He

testified that his pre-trial statements to Doe's counsel were lies. The guns, Jones said, were Doe's. The day before the search, Doe had taken them out from underneath the mattress and stairwell to show to him. *Id.* at 33–38. Jones had lied about planting the weapons, he said, because "some dudes" had "threatened, if I didn't call his lawyer, and tell the guns was mine some bodily harm would be done to me." *Id.* at 27–28. After hearing Jones' testimony, defense counsel asked the court to declare him a hostile witness and to permit her to cross-examine him. *See* FED.R.EVID. 611(c). The court agreed. Def.App., Tab E at 39.

At the same time, however, the court rejected defendant's renewed request for "information regarding [Jones'] sealed cases" and "agreements he's made with the government regarding those cases." *Id.* The court denied the request regarding the sealed cases saying, "I'm not going to at this late juncture make any effort to get those sealed records from the Superior Court." Besides, the court said, any agreements reflected in the records of those cases "don't have anything to do with this case anyway." *Id.* at 42.

■ Persistently, but tactfully, defense counsel asked that the court at least direct the government to turn over its own agreements with Jones, noting "[t]hat doesn't require anything from Superior Court." *Id.* The prosecutor replied that there was no agreement in the instant case, but made no representation about

agreements in other cases.[2] She did state, however, that "I think there may be some records that the police might have [although] I certainly don't have anything right now." More important, she continued, "I don't think the government has an obligation to produce them to the defense in connection with a defense witness." *Id.* The court agreed, ruling that the government was not required to produce records "in regard to a defense witness." *Id.* at 43. The court advised defense counsel that she was free, however, to question Jones about any agreements he might have. *Id.*

Doe's counsel proceeded to do so, but Jones denied being a "snitch," *id.* at 50, said "I haven't told on anybody," *id.* at 53, and denied having "an agreement with the government," *id.* at 57–58. Doe's counsel did not impeach Jones or otherwise offer affirmative evidence of prior agreements or government cooperation. The jury convicted Doe of the offenses charged in the indictment, and the court sentenced him to 92 months in prison.

## II

■ In *Brady v. Maryland*, the Supreme Court held that the Due Process Clause imposes upon the prosecution an obligation to disclose "evidence favorable to the accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194; *see Pennsylvania v. Ritchie,*

---

**2.** In its brief before this court, the government states that it has "no reason to believe that any agreement existed between the United States Attorney's Office and Mr. [Jones] with respect to his case in Superior Court." Gov't Br. at 34 n.17 (citing, *inter alia*, Gov't App., Tabs A–F). We are confused by the government's statement since its citations, recently prepared transcripts of some of Jones' Superior Court appearances, appear to refer to such an agreement. *See* Gov't App., Tab C at 3 (statement by defense counsel that "[Jones] has been cooperating with providing information"; reply by Assistant U.S. Attorney that "we will need to ensure that the agreement is followed through"); *id.*, Tab E

at 3 (statement by court that at sentencing "[i]t was included in the representation by prosecution that the defendant was cooperating"). *But see id.*, Tab F at 7 (statement by prosecutor that "I have no information whether or not the defendant is cooperating"). It may be that the government regards the cooperation agreement referred to in these transcripts as one involving the police rather than the U.S. Attorney's Office. If that is the distinction the government is drawing, it is of no moment to its obligations under *Brady. See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Brooks,* 966 F.2d 1500, 1503 (D.C.Cir.1992).

480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). In *Giglio v. United States* and *United States v. Bagley*, the Court held that "impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (quoting *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). And in *Kyles v. Whitley*, the Court held that the rule includes evidence "known only to police investigators and not to the prosecutor." 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Hence, to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Id.* at 437, 115 S.Ct. 1555.

■ As the Supreme Court recently noted in *Strickler v. Greene*, courts have used the term "*Brady* violation" to cover a multitude of prosecutorial sins involving breach of "the broad obligation to disclose exculpatory evidence," often called "*Brady* material." —— U.S. ——, ——, 119 S.Ct. 1936, 1948, —— L.Ed.2d ——, —— (1999). These include both the failure to search for *Brady* material and the failure to produce it. "[S]trictly speaking," however, "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* As the Court explained, a "true *Brady* violation" has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* To satisfy the prejudice component, the withheld evidence must be "material"; that is, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

*Id.* (quoting *Bagley*, 473 U.S. at 676, 105 S.Ct. 3375); *see also Kyles,* 514 U.S. at 433–34, 115 S.Ct. 1555. If the undisclosed evidence is material, a new trial is required. *Kyles,* 514 U.S. at 421–22, 115 S.Ct. 1555.

It appears from the parties' briefs that, contrary to Doe's original understanding, the records of Jones' Superior Court cases[3] were not sealed. Gov't Br. at 36 n.21; Oral Arg. Tr. 14–15. Hence, Doe's request for access to those records is effectively moot. His request for the disclosure of agreements between Jones and the government, however, remains very much alive. The government's appellate brief advises us that Jones did "provid[e] information to the police as a paid special employee," Gov't Br. at 34 n.17, and its appendix discloses that Jones was required, as a condition of probation in one of his Superior Court cases, to cooperate with the police, *see* Gov't App., Tab C at 3–4. At oral argument, the government also advised that "in candor with the court, it might involve the FBI, it might involve the DEA and other law enforcement agencies" as well. Oral Arg. Tr. at 29.

■ We therefore proceed to examine the arguments asserted by the government in support of its contention that, even if cooperation agreements exist, it has no *Brady* obligation to produce them. We conduct this examination de novo, since whether the government has breached its obligations under *Brady* is a question of law. *United States v. Cuffie*, 80 F.3d 514, 517 (D.C.Cir.1996); *United States v. Lloyd*, 71 F.3d 408, 411 (D.C.Cir.1995).

**A**

■ At trial, the prosecutor argued and the court agreed that *Brady* did not apply because Jones was a defense witness. In response, the defendant points out that the Supreme Court's description of the government's *Brady* obligations encompasses

---

3. Jones has convictions for carrying a pistol without a license, attempted possession with intent to distribute cocaine, and attempted distribution of cocaine. Gov't Br. at 6 n.7.

evidence that can be used to impeach the credibility of a witness, and does not on its face distinguish between impeachment of a prosecution witness and impeachment of a witness for the defense.[4] The government replies that the Court's references to impeachment in *Bagley* and *Giglio* involved prosecution witnesses (the same was true in *Strickler*), and that *Brady* and its progeny therefore do not require disclosure of impeachment evidence concerning a defense witness. "The Due Process Clause," the government notes, "does not provide 'a general constitutional right to discovery in a criminal case, and *Brady* did not create one.'" Gov't Br. at 17 (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977)). To require disclosure of potential impeachment regarding defense witnesses, the government argues, would effectively "displace the adversary system as the primary means by which the truth is uncovered"—a result not intended by *Brady*. *See Bagley*, 473 U.S. at 675, 105 S.Ct. 3375; *see also United States v. Agurs*, 427 U.S. 97, 109, 112 n. 20, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

In the usual case there is a conceptual difference between the impeachment of a government witness and the impeachment of a defense witness. Evidence that impeaches the former is almost invariably "favorable" to the accused, because by making the government's case less credible it enhances the defendant's chances of acquittal. Evidence that impeaches a defense witness, by contrast, is not generally favorable to the accused; by reducing the credibility of the defendant's own witness, such impeachment reduces the probability that he will obtain a not guilty verdict. It is ordinarily the prosecutor rather than defense counsel who wants to use the latter kind of evidence—although she may prefer to delay its use (and disclosure) until after the witness testifies, both to prevent tailoring of the testimony in expectation of the cross-examination and to employ the element of surprise to expose the witness' mendacity.

But Doe's is not the usual case involving impeachment of a defense witness. First, although it is true that defense counsel's original plan was to put Jones on the stand as her own witness (either directly or through the testimony of the investigator), had things gone as planned she would have had no reason to impeach Jones' credibility. It was only after Jones "flipped" and started testifying against Doe that defense counsel wanted to impeach him, hoping that evidence of a cooperation agreement would help her do so by showing that Jones lied when he said he had never "snitched" on anyone. Hence, even if we were to accept the proposition that only the impeachment of a government witness falls within *Brady*, by the time Jones flipped he had effectively become a government witness—as the court recognized by declaring him hostile. *See Kyles*, 514 U.S. at 445–46, 115 S.Ct. 1555 (ordering new trial where defense could have called informant as adverse witness and effectively used undisclosed evidence as impeachment).

Second, and more important, the underlying reason Doe sought information about Jones' relationship with the government was not to impeach Jones' statement, but to use it as affirmative evidence of Doe's own innocence. Indeed, if all had gone as planned, Doe would not have used evidence of a cooperation agreement to *impeach* Jones' statement that he planted the guns, but rather to *corroborate* it by exposing his motive for doing so. With the testimony of Doe's girlfriend that Jones had been alone in the basement, Doe had corroboration of Jones' opportunity to plant the weapons. What he needed was evidence of motive, and any of several kinds of cooperation agreements might have provided it. *See Bagley*, 473 U.S. at 683, 105 S.Ct. 3375 (stating that where "the possibility of a reward had been held

---

4. *See Kyles*, 514 U.S. at 433, 115 S.Ct. 1555 (noting that in *Bagley* "the Court disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes").

out" to witnesses for providing useful information, "[t]his possibility . . . gave [the witnesses] a direct, personal stake in respondent's conviction").[5] For example, if there were an agreement that the prosecution would seek the reduction of Jones' Superior Court sentences if he provided "substantial assistance in investigating or prosecuting another person," see FED. R.CRIM.P. 35(b), that agreement might have given him a motive to plant the guns. Similarly, if cooperation with the police were a condition of Jones' continued probation on his Superior Court convictions, that might have provided an incentive. And Jones might also have had a motive if the police had agreed to pay him in return for information leading to successful arrests.[6] As noted above, there is evidence in the record that at least the latter two kinds of agreements may exist. See Gov't App., Tab C at 3–4 (Superior Court hearing transcript indicating cooperation with police was condition of Jones' probation); Gov't Br. at 34 n.17 (noting that Jones "provided information to the police as a paid special employee"); Oral Arg. Tr. at 29 (noting that Jones may also have had arrangements with the FBI and DEA). By providing evidence of motive, such agreements would have been relevant to Doe's defense independent of any impeachment value they might also have had once Jones turned on him.

Finally, as the government conceded at oral argument, in the circumstances of this case an agreement that gave Jones a motive to plant the guns would be *Brady* material even if Jones never appeared as a witness for either side. Oral Arg. Tr. at 21, 27; see *Kyles,* 514 U.S. at 446, 115 S.Ct. 1555; *United States v. Lloyd,* 992 F.2d 348, 351 (D.C.Cir.1993). Indeed, in that respect this case is similar to *Kyles,* where the Supreme Court found that the prosecution violated *Brady* by failing to disclose evidence that an informant who never testified might have planted the murder weapon in defendant's apartment, 514 U.S. at 453, 115 S.Ct. 1555, including evidence of the informant's motive. *See id.* at 429, 115 S.Ct. 1555 (noting defense theory that informant planted gun for purposes of "removing an impediment to romance with [Kyles' common-law wife] . . . and obtaining reward money" from police). That kind of evidence is exculpatory in the purest sense, and its relevance does not depend on who sponsors its admission. Indeed, once Doe's girlfriend testified that Jones had been alone in the basement, evidence of an agreement giving Jones a motive to plant the guns would have been admissible (assuming authentication) even if Jones had never entered the courtroom. Accordingly, the fact that Jones was originally proffered as a defense witness has no consequence for the scope of the government's *Brady* obligations here.

**B**

The potpourri of other objections to disclosure argued by the trial prosecutor and sustained by the trial court are also unpersuasive. The court's original rejection of the defendant's pretrial *Brady* motion correctly rested on the ground that, as matters then stood, the informant's identity was confidential and "how the informer in this case might be helpful to the defen-

---

5. *Cf. Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (vacating judgment where court barred cross-examination about prosecutor's agreement to drop charge in exchange for witness' promise to speak with prosecutor, because "a jury might reasonably have found [it] furnished the witness a motive for favoring the prosecution").

6. There is, of course, nothing inappropriate about such agreements. *See United States v. Ramsey,* 165 F.3d 980, 988–90 (D.C.Cir.1999)

(noting legitimacy and law enforcement value of "prosecutorial promise(s) of leniency in exchange for truthful testimony"). And we certainly do not suggest that any such agreement would, or could, have authorized Jones to plant the guns. Rather, the point is simply that such an agreement may give a person a motive that the jury must be permitted to evaluate. *See Van Arsdall,* 475 U.S. at 679, 106 S.Ct. 1431; *Bagley,* 473 U.S. at 683, 105 S.Ct. 3375; *Giglio,* 405 U.S. at 154–55, 92 S.Ct. 763; *United States v. Smith,* 77 F.3d 511, 513 (D.C.Cir.1996).

dant" was speculative. Def.App., Tab A at 83. *See United States v. Mangum,* 100 F.3d 164, 172 (D.C.Cir.1996) (upholding nondisclosure of confidential informant's identity where defendant's assertion that informant planted gun in knapsack was "purely speculative" and there was no evidence informant had access to knapsack); *United States v. Warren,* 42 F.3d 647, 654 (D.C.Cir.1994) ("Speculation as to the information the informant may provide is insufficient."). By the time the case went to trial, however, those factors no longer applied. Jones had voluntarily revealed himself to defense counsel, and had told her he planted the evidence in Doe's basement. He had also told her that he was cooperating with the police in order to work off the gun and drug case he had in Superior Court. This, together with the statement in the affidavit for the search warrant that the informant had previously "given information which has led to the arrests of several subjects," Def.App. 11, moved the possibility that a materially relevant cooperation agreement existed far beyond the realm of speculation. *See generally Roviaro,* 353 U.S. at 60–65, 77 S.Ct. 623.

■ Nor is there any basis for the rulings that production of the requested information was "premature," first until it was clear Jones would testify, and then until after Jones actually did testify. Contrary to the prosecution's contention, the information did not become relevant only after Jones changed his story, giving the defense reason to impeach him. As noted above, evidence of Jones' motive was relevant independent of when or whether he testified. Similarly, we reject the government's suggestion that ordering a *Brady* search before Jones testified would somehow have been inconsistent with our admonitions in *United States v. Marshall* (made with reference to FED.R.CRIM.P. 16), that "[t]o give rise to a disclosure obligation, the evidence's materiality must, of course,

be evident to a reasonable prosecutor," and that the "prosecutor need not guess that evidence may become material as a consequence of a defendant's not-yet-revealed strategic decisions." 132 F.3d 63, 69 n. 2 (D.C.Cir.1998). At least from the moment defense counsel made the claim in her opening statement that Jones planted the guns, it was clear that any motive Jones might have had to do so was relevant to the case. No clairvoyance on the part of the prosecutor was required.

■ We also reject the government's Catch-22 rationale that once Jones did testify, it was by then too late to compel production of the information, since doing so would have required a continuance to gather the materials. The government protests that "in the midst of the trial" it should not have been required to "scamper" about searching for the requested evidence. Gov't Br. at 32. But that problem could have been avoided had the government gathered the material earlier. In light of the defendant's opening statement, it was no excuse the next morning that the prosecutor did not "have access to that information readily" and "would have to go back to my office and try to pull out old files and everything else." Def.App., Tab D at 68. The same was true that afternoon, when she said, "I think there may be some records that the police might have [but] I certainly don't have anything right now." *Id.,* Tab E at 42. And we do not understand the basis for the government's argument that "appellant cannot credibly complain because he failed to assert a timely demand for this impeachment material." Gov't Br. at 40. To the contrary, defendant made his demands known early, often, insistently, and with specificity— only to be met with the government's claims that they were first premature, and then too late. If by the time Jones testified the government still needed to "scamper" to collect the requested *Brady* material, it had no one to blame but itself.[7]

---

7. Indeed, the government knew from the opening bell that it would at least have to prepare to conduct its own cross-examination of Jones. *See* Def.App., Tab B at 15 (listing defendant's potential witnesses). Hence, it should not have needed the compulsion of *Brady* to learn all it could about him. *See*

**896**

■ We find equally unfounded the argument that any agreements Jones may have had in his Superior Court cases "don't have anything to do with this case." Def.App., Tab E at 42. Defendant's whole point was that Jones may have planted the gun in this case in order to "work off" obligations that arose in those Superior Court cases. Hence, agreements in the other cases have everything to do with this case. Nor does it matter that agreements in other cases may have involved other prosecutors. The United States Attorney's Office for the District of Columbia prosecutes cases in both the federal District Court and the local Superior Court, and the prosecutor is responsible (at a minimum) for all *Brady* information in the possession of that office. *See Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (holding that ignorance by one prosecutor of promise made by another is irrelevant since "[t]he prosecutor's office is an entity and . . . [a] promise made by one attorney must be attributed, for these purposes, to the Government").

■ For a similar reason, we reject as irrelevant the contention that the requested records may have been in the possession of the Metropolitan Police Department, or the FBI or DEA, rather than the U.S. Attorney's Office. As the Supreme Court held in *Kyles*, "[t]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. at 437, 115 S.Ct. 1555. Anticipating *Kyles*, we specifically held in *United States v. Brooks* that prosecutors in this circuit are responsible for disclosing *Brady* information contained in MPD files, "[g]iven the close working relationship between the Washington metropolitan police and the U.S. Attorney for the District of Columbia (who prosecutes both federal and District crimes, in both the federal and Superior courts)." 966 F.2d 1500, 1503 (D.C.Cir.1992). The same is true for files of the FBI and DEA which, like the

U.S. Attorney's Office, are components of the U.S. Department of Justice. *See id.* (noting that *Brady* requires prosecutors to search FBI records).

### C

■ Next, we consider the government's appellate argument that it did not breach a disclosure obligation with respect to Jones' cooperation agreements because that information was otherwise available through "reasonable pre-trial preparation by the defense." *Xydas v. United States*, 445 F.2d 660, 668 (D.C.Cir.1971). We note at the start that we find this argument somewhat surprising. The government concedes that it has not yet conducted a full *Brady* search of its own, and hence does not know the details of any agreements Jones may have had. *See* Oral Arg. Tr. at 22–24, 29–30, 38–39. In particular, the government advises that it knows nothing of his arrangements with the MPD other than that Jones was a "paid special employee," Gov't Br. at 34 n.17; Oral Arg. Tr. at 29, and nothing at all of any arrangements he may have with the FBI or DEA, Oral Arg. Tr. at 38–39. We do not understand how the government can confidently assert that defense counsel could have learned the contents of Jones' agreements when the government concedes that it has no idea what those contents are.

According to the U.S. Attorney, the first place the defendant should have turned for information about Jones' agreements was Jones himself. Jones, the government points out, voluntarily contacted defense counsel and "was, for a time, cooperative with the defense." Gov't Br. at 32. "Since defense counsel had an opportunity to probe [Jones'] relationship with the government . . . during their January . . . conversation [in the restaurant parking lot], appellant cannot now use *Brady* as a vehicle to get answers to questions left unasked at that time." *Id.* at 33. Again, we find this argument surprising. The

*Brooks*, 966 F.2d at 1502–03 (noting that "prosecutor's own interest in avoiding surprise at trial gives him a very considerable incentive to search accessible files").

government's position at trial was that virtually everything Jones said to defense counsel at the January meeting was a lie, a position the government maintains on appeal. Oral Arg. Tr. at 26–27. Surely information obtained from a government-certified liar cannot substitute for information obtained from the government itself—particularly not when the defense was seeking information from a more trustworthy source in order to corroborate (or, as became necessary, impeach) that individual.

■ Second, the government contends that if Doe wanted to learn of Jones' agreements with the MPD, he should have subpoenaed the involved officers themselves. Gov't Br. at 33. This argument, too, is unpersuasive. As we have noted above, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police,'" *Strickler*, —— U.S. at —— n. 12, 119 S.Ct. at 1945 n. 12 (quoting *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555), and particularly including the MPD, *see Brooks*, 966 F.2d at 1503. Accordingly, defense counsel was no more required to subpoena the officers to learn of their agreements, than she was to subpoena the prosecutor to learn of hers. The appropriate way for defense counsel to obtain such information was to make a *Brady* request of the prosecutor, just as she did. *See United States v. Iverson*, 648 F.2d 737, 739 (D.C.Cir.1981) (holding that "the primary obligation for the disclosure of matters which are essentially in the prosecutorial domain lies with the government"). Indeed, at oral argument the government agreed that had Jones been a government witness, it would readily have produced his cooperation agreements without insisting on a subpoena, Oral Arg. Tr. at 32–33, just as *Giglio* and *Bagley* contemplate. Since Jones' status as a defense witness is irrelevant here, there is no reason to require any other procedure.

## D

Finally, the government argues that Doe was not prejudiced by any nondisclosure that may have occurred because Doe's attorney failed to impeach Jones with the information she did have in her possession. When Jones denied under oath that he had ever informed on anyone else, Def.App., Tab E at 53 ("I haven't told on anybody"), counsel could have contradicted him with the sworn affidavit attached to the search warrant application, Def.App. 12 ("The source has given information which has led to the arrests of several subjects"). She might also have tried to use a representation made by Jones' attorney at the bench almost immediately after Jones made his denial. *Id.*, Tab E at 61 (advising the court that there "was a stipulation of [Jones'] probation to assist the police on the street"). Defense counsel did not attempt to use either one.

There is no doubt that this argument is relevant to the ultimate question of the materiality of the undisclosed evidence, that is, whether there was "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, —— U.S. at ——, 119 S.Ct. at 1948 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375). But an evaluation of the significance of the evidence that was available to the defense cannot begin until the government determines whether there was any evidence that was unavailable. If the information the government finds about Jones' agreements is the equivalent of that which the defense already had, then it may well not be material for *Brady* purposes. *See Iverson*, 648 F.2d at 738 ("[N]o violation of due process results from prosecutorial nondisclosure if defense counsel both knows of the information and is able to make use of it but still chooses, for tactical reasons, not to do so.").

On the other hand, the evidence that was available to Doe only indicated that Jones had cooperated with the government, and perhaps that he had an agreement to do so. It did not disclose, at least not explicitly, the terms of any such agreement and whether they gave Jones a mo-

tive to plant the guns in Doe's house. The latter would not have been the equivalent of what the defense already knew and, depending on the other facts in the case, may or may not have been material for *Brady* purposes. *See United States v. Smith*, 77 F.3d 511, 512–13 (D.C.Cir.1996) (holding that although aspects of witness' plea agreement were known to defense, undisclosed elements were material to defendant's ability to impeach); *Cuffie*, 80 F.3d at 517–18 ("[T]he fact that other impeachment evidence was available to defense counsel does not [necessarily] render additional impeachment evidence immaterial.") (internal quotations and citations omitted). Needless to say, until we know whether such information exists, we are unable to determine whether it would have been material. *See Pennsylvania v. Ritchie*, 480 U.S. at 57, 107 S.Ct. 989 ("At this stage, of course, it is impossible to say whether any information in the ... records may be relevant to [defendant's] claim of innocence, because neither the prosecution nor defense counsel has seen the information....").

## III

The government concedes that it never conducted a full-fledged *Brady* search with respect to any agreements its various components may have had with Jones. *See* Oral Arg. Tr. at 23–24, 29–30, 38–39. For the reasons stated above, that failure constituted a breach of the government's "duty to search" for *Brady* information. *Brooks*, 966 F.2d at 1502–03. In their arguments before this court, both the government and the defendant agreed that were we to find such a breach of the obligation to search, the proper disposition would be to remand this case to the district court, "to conduct a further evidentiary hearing to resolve whether there exists any *Brady* information and whether such information was material." Gov't Br. at 18 n.11; *see* Def. Br. at 20.

This is the course we have followed in other cases, *see Brooks*, 966 F.2d at 1504–05; *United States v. Lloyd*, 992 F.2d at 352, and the course we follow here as well.

"On remand, the district court should require the U.S. Attorney's [O]ffice to do what it should have done earlier," 966 F.2d at 1504, namely, to review information held by that office, as well as the MPD and other relevant law enforcement agencies, to determine whether the government has or had any agreements with its informant of the kind discussed in this opinion. If the government finds that such agreements exist, the district court must then determine whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, —— U.S. at ——, 119 S.Ct. at 1948 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375).