# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 10, 2023          Decided June 2, 2023

No. 21-3039

UNITED STATES OF AMERICA,
APPELLEE

v.

IVAN LAMONT ROBINSON,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00098-1)

———

*Michael Mestitz,* appointed by the court, argued the cause for appellant. With him on the briefs were *Steven R. Kiersh* and *Charles L. McCloud*, appointed by the court.

*Michael E. McGovern*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb*, *Suzanne Grealy Curt*, and *John P. Dominguez*, Assistant U.S. Attorneys.

Before: MILLETT and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*:    Appellant Ivan Robinson appeals his criminal convictions for forty-two counts of prescribing a controlled substance without a legitimate medical purpose under 21 U.S.C. § 841(a) and two counts of money laundering under 18 U.S.C. § 1957.  For the reasons set forth herein, this Court reverses and remands the district court's judgment of conviction and sentencing.

## I.  Background

In 2013, Appellant Ivan Robinson practiced as a nurse practitioner in Washington, D.C., specializing in back pain. In his practice, Robinson treated patients with a three-part method which he had designed.  His proprietary method of treatment involved a traction table he invented, various instructions on supplements and hydration, and prescriptions for thirty milligrams of oxycodone. He usually charged around $370 and only accepted payment in cash or money orders. Eventually, two local pharmacies notified law enforcement after they grew suspicious of the number of young people with Robinson's oxycodone prescriptions and the uniform high dosage of thirty milligrams. Concerned that Robinson might be illegally prescribing oxycodone to addicted pill-seekers, the Drug Enforcement Agency subsequently sent three undercover agents to his practice in 2013. One agent complained of foot pain.  Robinson declined to treat her, saying his practice only specialized in back pain.  The other two agents, Adams and Lee, claimed to be suffering from back pain, and Robinson treated them. These agents' testimony at trial about Robinson's

examination and treatment of them underlies part of his appeal to this Court. *See infra* Part II.3.

In 2016, a federal grand jury indicted Robinson on fifty-five counts of prescribing a controlled substance without a legitimate medical purpose under 21 U.S.C. § 841(a) and allegations of forfeiture. *United States v. Robinson*, Crim. No. 16-98, 2020 WL 5569953, at *2 (D.D.C. Sept. 17, 2020). A superseding indictment the following year increased the prescription charges to sixty-one counts, of which the government eventually dropped eighteen, and added two counts of money laundering. *Id.*; *see also* A83–88. The indictment listed eight real patients and the two undercover agents to whom Robinson prescribed sixty, thirty-milligram tablets of oxycodone each. *See* A83–88. The eight real patients were later identified as actual pill-seekers addicted to oxycodone.

Robinson was tried in 2017 before a jury in the United States District Court for the District of Columbia. *Robinson*, 2020 WL 5569953, at *2. The government presented evidence from several pharmacists who refused to refill Robinson's prescriptions due to their concerns that his patients were pill-seeking. *See, e.g.*, A1581:22, A1582:13–16 (testimony from pharmacist DeLisa Winston stating that "one of the reasons that [she] did reach out was because the patients were receiving the exact same medications."); *see also* A1595:1–5 (testimony from pharmacist Vincent Ippolito that "[a]ll [of Robinson's] prescriptions were written for the same item: Oxycodone, 30 milligrams, quantity of 60. . . . Most of the patients seem[ed] to be fairly healthy. They were young."). The government also elicited testimony from all three DEA agents involved in the undercover operation at Robinson's practice. *See, e.g.*, A1876 (Adams), A2197 (Lee), A2468 (Gutierrez). Adams and Lee testified that Robinson scarcely physically examined them and

failed to give them individualized care. *See* A1959–61; A2214–15. The government also called many of Robinson's patients from the indictment who testified similarly— Robinson only accepted cash, then money orders, *see* A2536 (Townsend); he treated patients in a group, not individually, *see* A2821–22 (Lusby); and his patients saw his practice as "a place to get easy medication, a source of medication," A2864:1–2 (Copsey); *see also* A3089–93 (Goble), A3145–48 (Thomas). Several bank employees testified for the government as to Robinson's banking practices and money order deposits. *See* A1244–47, 1802–09. A pharmacy employee who sold money orders, Sahar Bockai, Jr., testified about customers buying $370 money orders in the vicinity of Robinson's practice during the years he practiced. *See* A1083–86. Importantly, the government also presented expert witness Dr. Mark Romanoff, whom the court certified in a pretrial *Daubert* hearing. *See* A381–458. Romanoff testified regarding how providers should establish a medical relationship with their patients and the national standard for proof of that relationship. *See, e.g.*, A3723–26.

In his defense, Robinson presented testimony from Dr. Erica Brock, a chiropractor who worked with him, concerning his record-keeping. A2775–86. She testified that Robinson would call the police on patients who tried to obtain medication using fake MRIs. A4333:11–15. Dr. Yolanda Lewis-Ragland also testified for Robinson, stating that in order to treat his patients by manipulating their spines, Robinson needed to use "adequate pain management." A4540:5–6. Robinson also presented a number of character witnesses in his defense.

The trial lasted approximately twenty days. *Robinson*, 2020 WL 5569953, at *2. After deliberating for two-and-a-half days, the jury acquitted Robinson on one count and found him guilty on the other forty-two prescription counts and two

money laundering counts. *See* 5016, 5133, 5271–73; A153–65. It also found liability on some of the forfeiture allegations. A166–69. The court sentenced him to 135 months' imprisonment.

After sentencing, Robinson moved for a new trial and to reverse his convictions. In these motions, Robinson alleged *Brady* violations for the government's failure to disclose three reports: (1) two Pryor Reports, so named for DEA Agent Pryor, showing that Robinson called the DEA in 2011 to discuss fraudulent prescriptions, A208–211; and (2) the "CCN" Report from the D.C. Metropolitan Police detailing a specific instance in 2013 in which Robinson contacted law enforcement about a pill-seeker, A187–95. Robinson also argued that the government violated *Napue v. Illinois*, 360 U.S. 264 (1959), by introducing false testimony from the undercover DEA agents posing as patients at Robinson's clinic. He finally argued that the government's expert, Dr. Romanoff, failed to follow his own methodology for reviewing Robinson's patients' charts, and the court should therefore exclude his testimony.

In two separate opinions, the district court rejected all of Robinson's post-trial arguments and denied the motions. In its first opinion, the court conducted a *Brady* analysis and concluded that the Pryor Reports *were* favorable to Robinson and suppressed by the government. *Robinson*, 2020 WL 5569953, at *7. However, it ultimately found the Reports immaterial principally because they were cumulative of other evidence Robinson introduced at trial, and therefore their suppression had not hampered Robinson's theory of defense. *Id.* at *8–11. The court also found that the CCN Report was favorable to Robinson but not suppressed, and also not material, because a DEA report, A181–86, made at the same time about the same instance and that *was* available to Robinson, included all of the relevant information regarding

the incident, *id.* at \*12. Addressing Robinson's evidentiary argument regarding Dr. Romanoff's testimony, the court concluded that it was properly admitted at trial, given that Robinson had an opportunity to cross-examine Dr. Romanoff to highlight any inconsistencies, and because the court gave the jury instructions that they were not required to credit expert testimony. *Id.* at \*4.

In its second opinion, the court addressed Robinson's *Napue* argument and concluded that he had no valid argument that the government witnesses' testimonies were either false or material. *United States v. Robinson*, Crim. No. 16-98, 2021 WL 2209403, at \*9–10 (D.D.C. May 31, 2021). Robinson now revives each of these arguments on appeal to this Court. He also adds that the trial court lacked sufficient evidence under Federal Rule of Criminal Procedure 29 to convict him.

Because a favorable result to Robinson on sufficiency of the evidence would obviate the need for further proceedings due to the Constitution's prohibition on double jeopardy, U.S. CONST. amend. V, we will first discuss why the evidence in Robinson's case is sufficient. However, we will next explain how the government violated *Brady* in withholding the Pryor and CCN Reports, requiring us to reverse and remand this case to the district court. Finally, although the *Brady* error is dispositive of this appeal, the remand will open the possibility of a new trial, and Robinson's remaining arguments as to the evidentiary questions in the case are likely to arise again on retrial. We will therefore briefly discuss those last.

## II. Discussion

We review *de novo* Robinson's *Brady*, *Napue*, and sufficiency of the evidence arguments. *United States v. Vega*, 826 F.3d 514, 535 (D.C. Cir. 2016) (*Brady*); *United States v.*

*Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019) (*Napue*); *United States v. Lucas*, 67 F.3d 956, 959 (D.C. Cir. 1995) (sufficiency of the evidence). For sufficiency of the evidence challenges, we will uphold a guilty verdict supported by sufficient evidence so long as after viewing the evidence in the light most favorable to the prosecution, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We review under an abuse of discretion standard the district court's evidentiary rulings as to Dr. Romanoff's testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997).

1. *Sufficiency of the Evidence*

Robinson argues that the evidence at trial was insufficient to convict him. He contends that each of his actual patients included in the indictment, despite the fact that they were ultimately pill-seekers addicted to oxycodone, had real ailments to which he properly responded in good faith, and the government did not prove otherwise. He also argues that the two undercover DEA agents presented real MRIs with real injuries, leading Robinson to believe he was treating them appropriately.

After reviewing the government's evidence, we are satisfied a rational trier of fact could have found Robinson guilty. For example, the government presented testimony that: (1) Robinson concerned pharmacists so much with his uniform high dosage of oxycodone, the changing prescription formats, and the lack of consistent verification that they stopped filling his prescriptions, *see, e.g.*, A1581–82; (2) he appeared to have copied and pasted parts of one patient's medical records into another's multiple times, an offense for which a medical professional would usually suffer the suspension or loss of his license, A411–14; (3) he scarcely examined the government's

undercover DEA Agent Adams when she came to his practice, A1959–60, and did not provide her with medical advice in a private setting but rather in a large group, A1961; (4) he did not physically examine undercover DEA Agent Lee other than to pull on his legs, simply strapping him to the traction table without inquiring about his ailments or any prior injuries, A2214–15; (5) he treated many of his real patients in the same manner as the undercover agents, including patient Kevin Copsey, who testified that the first several times he visited Robinson's practice, Robinson did not physically examine him, *see* A2866–67; A3021; A2821–23; (6) Robinson frequently treated patients in groups rather than in private settings, *see* A3299–3300, 3093; and finally, that (7) he never advised many of his patients of a treatment plan or warned them about the dangers of oxycodone addiction, *see, e.g.*, A2874; A2974; A3147–48; A3303; A3309–10.

As the government's expert, Dr. Romanoff, explained, the defining aspect of a medically professional relationship with a patient to whom the provider will provide oxycodone is to "have asked [the patient] about their pain. You have made very specific inquiries about their pain, and *you have examined them* to try and figure out what is causing their pain." A3719 (emphasis added). Without this proper foundation, there is no legitimate basis for a provider to prescribe opioids. A3809:20–23 ("[GOVERNMENT]: [I]f there was no legitimate provider-patient relationship established before issuance of the prescription, then what would be your conclusion? [DR. ROMANOFF]: Then it would not be a legitimate prescription."); *see also* A3719, A3723–28. The government's evidence supports the conclusion that Robinson often simply did not establish a proper relationship with his patients before prescribing them oxycodone. We therefore hold that the evidence at Robinson's trial was sufficient to convict.

9

2. Brady

The *Brady* rule arises from the Supreme Court's case of *Brady v. Maryland*, 373 U.S. 83 (1963), and requires prosecutors to "disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial," *United States v. Bagley*, 473 U.S. 667, 675 (1985). In other words, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Courts use a three-part test for determining whether the government committed a *Brady* violation: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The prejudice requirement is one of materiality, where "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. In other words, the undisclosed evidence must raise a "probability sufficient to undermine confidence in the outcome." *Id.*

Robinson asserts the government violated *Brady* when it withheld three reports, the two Pryor Reports and the CCN Report, from the defense before and during trial. We agree.

The district court found no *Brady* violation in ruling on Robinson's post-trial motions. After applying *Brady*'s three-part analysis, it found (1) the Pryor Reports were both favorable to Robinson and suppressed by the government under *Brady*'s first two requirements, but not material under the last,

principally because they were cumulative of other evidence Robinson introduced at trial, and therefore their suppression did not "prevent Defendant Robinson from presenting his defense," *Robinson*, 2020 WL 5569953, at *7–8, *9; and (2) the CCN Report was favorable to Robinson but not suppressed by the government because it duplicated evidence Robinson already possessed, *id.* at *11–12. We disagree in both instances.

First, a word on the abovementioned "reasonable probability" standard. This test is not a particularly demanding one. This is true because the government's burden at the trial level is so demanding. *See United States v. Agurs*, 427 U.S. 97, 112 (1976), *holding modified by Bagley*, 473 U.S. 667 ("The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.").

That is to say, in this case the government won a verdict of guilty on forty-four counts. This required that all twelve jurors be convinced beyond a reasonable doubt of the defendant's guilt on each of those counts. *See id.* More specifically, all twelve jurors had to find beyond a reasonable doubt that, as to each individual patient in the forty-four counts, Robinson "knew that [he] was acting in an unauthorized manner" outside of a legitimate doctor-patient relationship, or intended to do so. *See Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022); 21 U.S.C. § 841(a). Had even one juror harbored a reasonable doubt as to the defendant's guilt on any count, the guilty verdict on that count could not have been returned. *See Agurs*, 427 U.S. at 112. Therefore, given that the evidence already showed that there may have been some instances in

which Robinson was a legitimate prescriber, it is not beyond reason that a juror might harbor doubt as to one count or another, which could have resulted in a hung jury rather than a verdict of guilty. Although the district court carefully dealt with all the questions in the case, we cannot sustain the verdict in light of the *Brady* violations.

To uphold a verdict in light of a *Brady* violation, the evidence must be sufficient to show that there is no reasonable probability that the verdict would have been different. *Bagley*, 473 U.S. at 682. Since it would have taken only one juror harboring a doubt to change the result, we cannot say that the record survives *Brady* analysis. While not essential to our decision, we note that in this case the jury deliberated for two-and-a-half days before it returned unanimous guilty verdicts on forty-four counts but acquitted on another count of illegally prescribing oxycodone without a legitimate medical purpose. This may at least suggest that some jurors verged on a conclusion that the government had not proven some count or counts beyond a reasonable doubt. This is especially so when we again remember that the government had the burden of proving each element of the case beyond a reasonable doubt. *See Agurs*, 427 U.S. at 112. Further, it is not unreasonable, in light of the jury's acquittal on one count, to imagine that some juror may believe as to one count that this *was* a legitimate patient, given that Robinson presented himself as an innovative and successful treater of back pain. It is at least reasonable to imagine that one or more jurors might conclude that the government did not prove beyond a reasonable doubt that this was *not* the case on one or more counts.

### i. Pryor Reports

First, we agree that the Pryor Reports were both favorable to Robinson and suppressed by the government.

These Reports were made by DEA Special Agent Lisa Pryor about incidents which occurred on January 11 and 25, 2011. The first shows that Robinson called the DEA to report that "someone was using his name on fraudulent prescriptions." A208. He reported that he had witnessed a "spike" in patients from Southern Maryland a few months prior and believed fraudulent prescriptions were being passed in his name there. A208–09. He further stated that he had audited his files and found a patient attempting to gain prescriptions from him in order to sell in Southern Maryland. A209. Agent Pryor's second report focuses on the same subject matter and reports that Robinson stated he "lost approximately eighty patients from the Southern Maryland area" whom he believed to be pill-seekers. A210. He also explained that he had contacted police in that area. *Id.*

We agree with the district court that the Pryor Reports were favorable to Robinson. As noted above, the Reports show that Robinson contacted law enforcement about fraudulent prescriptions and that he told law enforcement he had lost eighty patients to pill-seeking. *Robinson*, 2020 WL 5569953, at *7. The district court aptly noted that "[i]n a case in which Defendant Robinson is accused of illegally providing individuals with medication, such reports can be considered favorable to him." *Id.*

We also agree that the government suppressed the Pryor Reports. Robinson requested them on multiple occasions before trial and was told they did not exist. *Robinson*, 2020 WL 5569953, at *7. It was only about six months after trial, when Agent Pryor disclosed that another agent accompanied her when she spoke to Robinson and that *he* may have taken notes, that the government located and turned over the Reports. *Id.* at *7.

Most importantly, we disagree with the district court's conclusion that the Pryor Reports were immaterial under *Brady*'s third requirement. The district court found that the suppression of the Pryor Reports did not prejudice Robinson, and was therefore immaterial, principally because they were cumulative of other evidence Robinson introduced at trial. *Robinson*, 2020 WL 5569953, at *9–10. Such evidence included testimony that Robinson elicited that he kept a "security file folder on patients that are bad . . . [and] would have them arrested" and undercover video of Robinson himself telling patients he would report them to law enforcement for pill-seeking. *Id.* at *10.

We cannot conclude that Robinson's own evidence as to his behavior toward pill-seekers was cumulative of the Pryor Reports. Importantly, the Pryor Reports represent evidence from the *government's records themselves* that Robinson actually reported his patients' illegal activity to authorities. One or more jurors may have given far greater weight to the government's own reports that Robinson *did* report the behavior over Robinson's supposedly self-serving evidence testifying he *would have* reported such behavior. *Cf. In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 897 (D.C. Cir. 1999) ("Surely information obtained from a government-certified liar cannot substitute for information obtained from the government itself-particularly not when the defense was seeking information from a more trustworthy source in order to corroborate. . . ."). We note that the prosecution suggested in closing argument that the defense presented self-serving testimony and that "[e]verybody [was] playing their part so the defendant can make the money and the patients can get their prescriptions." A5080; *see also* Appellant Br. 3. We therefore hold the Pryor Reports were not merely cumulative of evidence Robinson presented at trial.

We instead conclude that they are material. The Pryor Reports show that Robinson proactively contacted two groups of law enforcement, local Southern Maryland police and the DEA, about pill-seeking behavior, which included the passing of fraudulent prescriptions in his name. They show that he audited his files to ferret out the pill-seekers. And most importantly, they may have raised a reasonable doubt in the mind of one or more jurors as to one or more charges that Robinson was illegally providing prescriptions to pill-seekers because he was in fact calling such behavior to the attention of authorities. *See* A208–11. We therefore conclude that the withheld information in the Pryor Reports presents "a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The suppression of the Reports could "undermine confidence in the outcome" of this case, *id.*, and we therefore hold the government committed a *Brady* violation when it withheld them.

### ii. CCN Report

We also hold that the government did in fact suppress the CCN Report, ultimately constituting a second *Brady* violation. The CCN Report memorializes an incident in which Robinson reported to the D.C. Metropolitan Police his suspicions about the pill-seeking behavior of a prospective patient in 2013. A189. The Report specifically shows that Robinson's office called to check the veracity of the patient's referral, found it to be false, and that Robinson physically retrieved his prescription of oxycodone from the patient after police arrived. *Id.*

The district court conducted a *Brady* analysis regarding the government's withholding of the CCN Report and found the Report was favorable to Robinson. *Robinson*, 2020 WL

5569953, at *11.  However, it then found that the government had not suppressed the Report under *Brady*'s second requirement because it provided a similar report made by the DEA about the same incident which gave Robinson "all [the] relevant information."  *Id.* at *12.  The district court concluded that "there is no *Brady* violation 'if the information was available to [the defendant] from another source.'"  *Id.* at *11 (alteration in original) (quoting *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007)); *see also id.* (listing cases from the Sixth, Eleventh, and Eighth Circuits); *id.* ("*Brady* violations involve discovery of information 'which had been known to the prosecution but unknown to the defense.'" (quoting *Agurs*, 427 U.S. at 103)).

First, we agree that the CCN Report was favorable to Robinson under *Brady*'s first requirement.  Second, while the district court's analysis regarding the availability of the same information from another source correctly describes the classic *Brady* violation, this violation is of another sort.  The prejudice to the defendant here occurs not from the lack of information contained in the Report, but from the inability to provide the more convincing source corroborating the information contained therein. *Cf. In re Sealed Case No. 99-3096*, 185 F.3d at 897.  It is nonetheless a deprivation of the defendant's right to potentially exculpatory evidence.  And it is undisputed that the government suppressed the CCN Report. *See* Oral Arg. Tr. 21:9–13 ("[THE COURT]: [W]hat is the explanation on why the CCN report wasn't turned over?  [GOVERNMENT]: Your Honor, the record doesn't indicate specifically why the CCN report was not turned over prior . . . .").

Third, we hold that the CCN Report was material.  It was not duplicative of the DEA Report, and the information it contained *was* unknown to Robinson.  While true the DEA Report contains more detail than the CCN Report, it does not

explicitly give evidence of Robinson's practice of checking patient referrals to ensure they were bona fide. *Compare* A181–86 (DEA Report), *with* A187–95 (CCN Report). The CCN Report specifically provides evidence that Robinson had a system in place for identifying fake referrals, the presence of which likely suggested pill-seeking. *See* A189 ("[Suspect] brought a refer[r]al into the [clinic] which [Robinson] called to have verified by the alledged [sic] medical clinic. [Robinson] learned through the alledged [sic] medical clinic that they had no such record of [suspect] being refer[r]ed to [Robinson]'s office by them."). And it shows that upon finding the fake referral, Robinson called police. *Id.* In a case where the government charges a defendant with providing illegal prescriptions to pill-seekers, this Report presents at least a "reasonable probability" that the jury might not have found Robinson guilty, and its suppression could undermine confidence in the jury's ultimate verdict. *See Bagley*, 473 U.S. at 682.

The remedy for a *Brady* violation is a new trial. *See Kyles v. Whitley*, 514 U.S. 419, 421–22 (1995); *see also United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) ("[O]nce a court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion." (citation omitted)). We therefore hold Robinson is entitled to a new trial due to the suppression of the Pryor and CCN Reports.

3. Napue *Violations*

As previously mentioned, we will briefly address Robinson's remaining evidentiary arguments, as they are likely to reappear in the district court. Robinson contends that the government violated its obligations under *Napue v. Illinois* by "introduc[ing] false or misleading testimony or allow[ing] it to go uncorrected [from the undercover DEA agents posing as

patients at Robinson's clinic and a person who sold money orders] . . . even though the government knew or should have known that the testimony was false." *United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015 (citations omitted)); *see also Napue*, 360 U.S. at 269.

More specifically, Robinson argues DEA Agent Adams gave false testimony about the extent to which Robinson asked her about her pain and examined her. He secondly contends that DEA Agent Lee falsely testified whether he told Robinson he was taking oxycodone and whether he told Robinson specifically about his pain. Finally, Robinson alleges a *Napue* violation for the government's introduction of allegedly false testimony from a seller of money orders, Sahar Bockai, Jr., as to the amounts, times of day, and suspiciousness of the money orders Bockai sold to customers in the vicinity of Robinson's practice. Robinson argues that he has satisfied the "hair trigger" test for setting aside his conviction, *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003), given what he argues is the "reasonable likelihood that the false testimony could have affected the judgment of the jury," *id.* (quoting *Agurs*, 427 U.S. at 103).

We, like the district court, disagree. These alleged "falsehoods" could not have reasonably swayed a jury. For one, each of the witnesses was testifying from his or her own memory about the events of which they were asked. Any honest mistakes in the witnesses' testimony could be, and in many instances were, highlighted to the jury through Robinson's impeachment of them on cross-examination. *See* Appellant's Br. 28 ("[Agent] Adams also had to be impeached before she admitted that Robinson spoke with her individually . . . ."); *see also id.* at 30 (stating that on cross-examination, "[Agent Lee] was forced to admit that testimony, too, was inaccurate."). The trial court also gave Robinson the option to

recall Bockai for impeachment, but Robinson declined. And the jury saw videos the undercover agents made while visiting Robinson's practice, enabling them to "assess the veracity of the agents' testimony about their visits" themselves. *Robinson*, 2021 WL 2209403, at *9. That Robinson impeached witnesses' testimony does not, as he suggests, connote a *Napue* violation. *See* Appellant's Br. 28–29. On the contrary, determining the credibility of these witnesses is precisely the role of the jury as factfinder. *Johnson v. United States*, 426 F.2d 651, 655 (D.C. Cir. 1970) ("Of all the issues which are in the highest order for a jury one is hard pressed to suggest one more firmly intended and more plainly suited for jury determination than that of [a witness's] credibility."). Therefore, the prosecution committed no *Napue* violation.

### 4. *Romanoff Testimony*

We finally turn to Robinson's contention that the district court erred in permitting Dr. Romanoff to testify as the government's expert under Federal Rule of Evidence 702. Pretrial, the district court conducted a *Daubert* hearing, A381–458, and ultimately qualified Dr. Romanoff as "an appropriate expert witness," *Robinson*, 2020 WL 5569953, at *4; *see also Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 592–95 (1993). At the *Daubert* hearing, Dr. Romanoff told the court that he conducted a chart review, examining a random sampling of Robinson's patients' records, looking for adequate documentation to support Robinson's prescription of opioids to the patients in the sample. A392–94. He testified that upon review of the charts, he "could not find a patient who received opioids that had appropriate documentation in the chart that would justify the use of that medication." A410: 12–14. Dr. Romanoff later reiterated at trial that many of the prescriptions Robinson wrote for oxycodone were invalid because a "patient-provider relationship [did] not exist." *See, e.g.*, A4020–21.

Robinson argues that Dr. Romanoff failed to follow the national standards of chart review by examining far fewer charts than required, reviewing only portions of those records instead of them in their entirety, and failing to consider contradictory evidence that helped Robinson's case. He contends that these alleged shortcomings prejudiced him because Dr. Romanoff provided the only inculpatory evidence against him as to some of the charges in the case.

Like the district court, we disagree. First, we will only overturn the district court on an evidentiary matter for abuse of discretion, *Gen. Elec. Co.*, 522 U.S. at 141, and we see no abuse here. The district court carefully assessed Dr. Romanoff's ability to testify as an expert at the pretrial *Daubert* hearing. *See* A381–458. During the hearing, Dr. Romanoff testified that he reviewed Robinson's patients' charts pursuant to the national standard. *See, e.g.*, A399–403. Robinson cross-examined Dr. Romanoff at the *Daubert* hearing, giving the district court the opportunity to hear about any potential problems with the doctor's testimony. *See, e.g.*, A417–38. Moreover, once the court qualified Dr. Romanoff as an expert, Robinson cross-examined him again at trial in front of the jury about alleged defects in his methodology, leaving the jury to weigh Dr. Romanoff's credibility as a witness. *Robinson*, 2020 WL 5569953, at *4; *see e.g.*, A4047–59 (cross-examining Dr. Romanoff about patient files he had not reviewed prior to trial). The district court also instructed the jury it was "not bound by [Dr. Romanoff's] opinion" in coming to its conclusion. A5103:12. Therefore, as with the government's other witnesses, the jury performed its exact role in assessing Dr. Romanoff's credibility. *See supra* Part II.3. We hold the district court did not abuse its discretion in permitting Dr. Romanoff to testify as an expert witness.

### III. Conclusion

We hold that the evidence at trial was sufficient to convict Robinson, and we affirm the district court on its *Napue* and expert testimony rulings. However, we reverse the district court on its *Brady* decision and remand this case for a new trial due to the government's suppression of the favorable and material Pryor Reports and CCN Report.

*So ordered*.