# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 22, 2007        Decided May 4, 2007

No. 06-3100

UNITED STATES OF AMERICA,
APPELLANT

v.

SORENSON O. ORUCHE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00287-01)

*Florence Y. Pan*, Assistant U.S. Attorney, argued the cause for appellant. With her on the briefs were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, *Kenneth F. Whitted*, and *T. Anthony Quinn*, Assistant U.S. Attorneys.

*Michael V. O'Shaughnessy* argued the cause for appellee. With him on the brief was *Mary C. Kennedy*.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The government charged appellee

Sorenson O. Oruche with one count of conspiracy to possess (with intent to distribute) and to distribute heroin, *see* 21 U.S.C. § 846; four counts of heroin distribution, *see id.* § 841; and four counts of interstate travel in aid of racketeering ("ITAR"), *see* 18 U.S.C. § 1952. The jury convicted Oruche on the conspiracy count, on three of the heroin-distribution counts, and on one of the ITAR counts. The jury failed to reach a verdict as to the remaining counts. Subsequently, the district court granted Oruche's motion for a new trial as to all his convictions, finding *Brady* violations, *see Brady v. Maryland*, 373 U.S. 83 (1963) (*Brady*), and violations of the Jencks Act, *see* 18 U.S.C. § 3500. The government brought this appeal pursuant to 18 U.S.C. § 3731, which authorizes appeal from an order granting a new trial in a criminal case. We conclude the district court erred and reverse the new trial order, remanding for further proceedings.

I

In summarizing the trial evidence, we focus on the counts that resulted in convictions. Count one, the conspiracy count, was based primarily on evidence offered in support of the other counts. In support of count two (ITAR), Tequila Williams and Alvin Ogar testified about a trip they took with Oruche on September 17, 2000, from Washington, D.C. to New York City. Williams drove Oruche's rented Jaguar to an apartment where Oruche obtained a baseball-sized package of heroin. He called Williams into the bedroom and directed her to put the heroin in her purse. Williams did so. Meanwhile, Ogar waited in the livingroom. Oruche, Williams, and Ogar spent about twenty minutes at the apartment and then drove back to D.C., leaving around 11:00 p.m. On the way back, Oruche told Williams he would "take the beef" if they got pulled over by police. They arrived in the District early in the morning on September 18, 2000, and Oruche drove to several locations, trying to arrange a meeting with someone named "Aaron." After Oruche met

with Aaron, he told Williams and Ogar that Aaron would have killed him if they had not been present.

Count three was a heroin distribution count. Williams and undercover police officer Robert Arrington testified about this transaction. Officer Arrington arranged to buy an ounce of heroin from Williams. On September 21, 2000, Arrington met Williams in a parking lot and negotiated a price for the heroin. Williams said she was "waiting for her man" and would be able to complete the transaction at 3:00 p.m. the same day at a strip club in the District where Williams worked as a bartender. Williams left the parking lot and called Oruche, who told her he was on his way. Officer Arrington arrived at the club at 2:45 p.m. and met with Williams who told him to wait in his car. A short time later, Oruche arrived in a Jaguar, went inside the club, and gave Williams the heroin. Williams walked out of the club, got into Officer Arrington's car, and sold him 24.1 grams of heroin for $4,000. Oruche left the club, and Williams later went to his hotel and gave him the money from the sale. As corroborating evidence, the prosecution presented audio and video recordings of Arrington conversing with Williams. In addition, video recordings showed Oruche entering the club at 3:09 p.m., Williams coming out at 3:18 p.m. to meet with Arrington, Oruche coming out at 3:22 p.m. and driving away, and Williams driving away at 3:26 p.m. Evidence of cell-phone usage also confirmed several calls between Williams and Oruche on the day of the transaction, including calls at 12:05 p.m., 12:08 p.m., 12:35 p.m., 2:11 p.m., 2:17 p.m., 2:53 p.m., 3:28 p.m., and 3:45 p.m.

Count five was another heroin distribution count. David Marley, a paid government informant with a significant criminal record, and Special Agent Mark Ross from the Drug Enforcement Administration (DEA) both testified. Marley became associated with Oruche; Oruche trusted him because

they were both African. In May 2001, Oruche solicited Marley to sell heroin for him. Oruche said he did not want to deal in amounts less than one hundred grams, which he would sell for $11,000. Marley contacted Special Agent Ross, and he and Ross began setting up heroin purchases. On June 12, 2001, Marley met Oruche in Oruche's vehicle, while Ross watched from a distance. Oruche gave Marley 176 grams of heroin and told Marley he wanted $16,000 in return. After Oruche left, Ross picked up Marley and took the heroin. Three days later, Marley went to Oruche's apartment and gave him $6,000 in pre-recorded DEA funds, as a partial payment toward the $16,000 purchase price. During this visit, Marley saw five one-hundred-gram "balls" of heroin lying on Oruche's bed. On June 26, 2001 and July 3, 2001, Special Agent Ross met directly with Oruche, paying him first $6,000 and then $4,000 in pre-recorded DEA funds, thereby satisfying the $16,000 debt owing from the June 12th transaction. As corroborating evidence in relation to this count, the prosecution presented tape recordings of conversations between Marley and Oruche.

Count nine was a third heroin distribution count. Marley and Special Agent Ross testified. On July 16, 2001, Marley went to Oruche's apartment and received a portion of a sweater into which "straws" containing a significant amount of heroin had been interwoven with the sweater yarn. Oruche asked Marley to extract the heroin from the sweater. Marley took the sweater and gave it to DEA officials who later determined it contained 212.9 grams of heroin (about half a pound). Marley and Oruche also discussed the removal of the heroin over the telephone, and this telephone call was recorded. Later the same day, Special Agent Ross called Oruche, and in a three-way telephone conversation between Ross, Oruche, and Marley, Ross told Oruche he wanted to buy two-hundred grams of heroin. Oruche agreed to make the sale. That evening, law-enforcement agents arrested Oruche at a rental car office near Union Station.

As noted, these counts resulted in convictions. On August 22, 2003, about a year after the convictions, the district court conducted a "*Kastigar* hearing" to determine whether the government had derived any of its evidence from an allegedly involuntary police interview with Oruche. *Cf. Kastigar v. United States*, 406 U.S. 441, 460 (1972) (government has burden of proving its evidence is not derived from testimony as to which the defendant had received Fifth Amendment immunity). At this hearing, held before a different judge than the judge who presided at Oruche's trial, prosecutors and law-enforcement officials testified about a "debriefing" session held with Tequila Williams shortly after her arrest on December 6, 2000. Detective Barbara Lyles identified a page of handwritten notes she had recorded during the debriefing session, along with a second page on which she had rewritten and expanded the notes written on the first page. (She claimed to be "almost positive" she rewrote the notes the same day as the debriefing.) The word "Tungy" (a name) appears on the first page of notes. Directly under the word "Tungy" is the word "coke." To the left of the word "Tungy"—in the margin and not clearly associated with the word "Tungy"—is the word "Heroin." Touching the "T" of the word "Tungy" is an ambiguous stroke of the pen, shaped like two sides of a triangle. Oruche argues this stroke of the pen is an arrow pointing from the word "Heroin" to the word "Tungy." The page also includes a few notations in Tequila Williams's handwriting. Specifically, Williams wrote three telephone numbers and also the words "O" and "Girlfriend (Leslie)" on Detective Lyles's notes. The prosecution provided these notes to the defense only a few days before the *Kastigar* hearing.

On December 2, 2003, the defense filed a motion for a new trial based on *Brady* and the Jencks Act, asserting Williams's cross-examination could have been much more effective if the defense had known about Williams's possible second source for heroin. This argument gained additional support from an

irregularity in Detective Lyles's testimony at the *Kastigar* hearing. Lyles first testified Tungy was in fact a heroin dealer, and Oruche and Tungy "had a shop off of Upshur Street." When asked whether Tungy sold heroin, Lyles answered: "With 'O,' yes, sir." Six months later, Lyles changed her testimony, submitting a sworn affidavit to the court, explaining Tungy was a cocaine dealer, not a heroin dealer, and claiming she had testified incorrectly in this regard because she was mistaken. Detective Lyles also testified about this mistake in hearings held before the judge who presided at Oruche's trial.

The *Brady*/Jencks Act motion remained unresolved on December 14, 2004, when the government informed the district court it had discovered additional impeachment evidence regarding Tequila Williams. Specifically, the government eventually produced a transcript of testimony Williams gave to a grand jury concerning a former boyfriend's possible involvement in a murder. In this testimony, Williams implicated the boyfriend in the murder and admitted she had previously lied to police in an effort to protect the boyfriend. She testified: "[My boyfriend] told me not to [tell the truth], and he used to abuse me, so I thought that he'd probably beat me up or something." The government also produced notes of Williams's earlier statements to the police, in which Williams denied the boyfriend's involvement.

After receiving these additional documents, the defense renewed its request for a new trial based on *Brady* and the Jencks Act, arguing the additional impeachment evidence would have allowed the defense to characterize Williams as an admitted liar. In addition, the defense moved to dismiss the indictment with prejudice due to prosecutorial misconduct.

On May 17, 2005, the district court granted the motion for a new trial. The court stated the failure to disclose the

documents "significantly impaired defense counsel's ability to investigate new leads, to further impeach the credibility of a principal prosecution witness, Tequila Williams, and to make additional powerful arguments to the jury." The court found Detective Lyles's testimony "contradictory, evasive, oftentimes hostile" and declined to give it any credit. The court also suggested Lyles recently had prepared the second page of her notes from the Williams debriefing in a fraudulent effort to bolster her changed testimony. The court did not engage in any detailed analysis of how the defense might have used the impeachment evidence at trial or how the prosecution might have responded; rather, the court simply stated: "Since this Court cannot conclude that Oruche's trial was fair, this Court will grant his motion for a new trial, substantially for the reasons advanced by defense counsel and to avoid a miscarriage of justice." The government sought reconsideration, arguing the undisclosed evidence was not material and would not have affected the verdict, but the district court denied reconsideration, repeating that the failure to disclose the documents "significantly impaired defense counsel's ability to further impeach the credibility of a princip[al] witness and to make powerful arguments to the jury." The court also denied the motion to dismiss the indictment.

The government brought this appeal pursuant to 18 U.S.C. § 3731.

## II

Generally, this court reviews the district court's grant of a new trial for abuse of discretion. *See United States v. Hall*, 324 F.3d 720, 722 (D.C. Cir. 2003); *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997). However, when confronted with a "purely legal question," our review is de novo. *Hall*, 324 F.3d at 722; *see, e.g.*, *United States v. Marquez*,

291 F.3d 23 (D.C. Cir. 2002). *Brady* claims present something of a special situation. Thus, as to findings of fact made by the district court, including determinations of credibility made both at trial and in post-trial proceedings, this court would defer under an abuse of discretion standard. *See United States v. Sipe*, 388 F.3d 471, 478-79 (5th Cir. 2004); *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir. 1991); *Founding Church of Scientology of Wash., D.C., Inc. v. Webster*, 802 F.2d 1448, 1457 (D.C. Cir. 1986). But once the existence and content of undisclosed evidence has been established, the assessment of the materiality of this evidence under *Brady* is a question of law. In this inquiry, the question of prejudice is folded into the determination of whether a violation has occurred. As the Supreme Court has explained, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Therefore, once a court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion. *See Kyles v. Whitley*, 514 U.S. 419, 421-22, 435 (1995).

On review, then, the question is not whether the district court properly exercised its discretion to order a new trial, but whether the court properly found a *Brady* violation. This distinction makes a *Brady* ruling different from other new trial rulings, because "whether the government has breached its obligations under *Brady* is a question of law," subject to de novo review. *In re Sealed Case No. 99-3096* (*Brady Obligations*), 185 F.3d 887, 892 (D.C. Cir. 1999); *see also United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996); *United States v. Lloyd*, 71 F.3d 408, 411 (D.C. Cir. 1995). Because the question is one of law, we can aptly apply here a point we made in a different context: "'[l]ittle turns . . . on whether we label review of this particular question abuse of discretion or *de novo*,' for

'[a] district court by definition abuses its discretion when it makes an error of law.'" *Chappell-Johnson v. Powell*, 440 F.3d 484, 487 (D.C. Cir. 2006) (alterations in original) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

We review de novo the district court's finding that the Jencks Act applies, *United States v. Williams-Davis*, 90 F.3d 490, 512 (1996), and if we find a Jencks Act violation, we apply the harmless-error standard to determine whether a new trial is appropriate, *United States v. Lam Kwong-Wah*, 924 F.2d 298, 309-10 (D.C. Cir. 1991).

Oruche argues we should review the district court's decision for abuse of discretion because the court granted the new trial "for the reasons advanced by defense counsel and to avoid a miscarriage of justice." Oruche reads the district court's order as a broad finding of unfairness in the trial due to "improper conduct, evasive and incredible testimony, and suppression of material evidence," and therefore he cites non-*Brady*, non-Jencks Act cases emphasizing the wide discretion the trial court has to grant a new trial. *See United States v. Williams*, 113 F.3d 243 (D.C. Cir. 1997); *Weil v. Seltzer*, 873 F.2d 1453 (D.C. Cir. 1989); *Grogan v. Gen. Maint. Serv. Co.*, 763 F.2d 444 (D.C. Cir. 1985); *Schneider v. Lockheed Aircraft Corp.*, 658 F.2d 835 (D.C. Cir. 1981). This argument fails to appreciate the nature of our review where a *Brady* claim is the critical reason for the grant of a new trial. Oruche based his new trial motion on several asserted irregularities in the trial, not merely the *Brady*/Jencks Act issue, but the court's order granting a new trial makes clear the court was doing so based on *Brady* and the Jencks Act. Significantly, the court cited only *Brady* and the Jencks Act (and related cases) in its decision. We conclude therefore that our review of the district court's order is de novo.

10

III

Generally speaking, the Supreme Court's holding in *Brady v. Maryland* requires the government to disclose, upon request, material evidence favorable to a criminal defendant, including evidence held by law enforcement officials. 373 U.S. at 87. The materiality of the evidence is measured by the effect it would have had on the result of the trial, the focus being on fairness. *Kyles*, 514 U.S. at 433-34; *United States v. Bagley*, 473 U.S. 667, 678, 682 (1985). This court has previously articulated the materiality standard as follows:

> Our inquiry is confined to a determination of whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The Supreme Court has emphasized that the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Therefore, our focus is on the potential impact that the undisclosed evidence might have had on the fairness of the proceedings rather than on the overall strength of the government's case. Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict.

*Cuffie*, 80 F.3d at 517 (internal alteration, citations, and quotation marks omitted). Thus, in regard to an asserted *Brady* violation the question is whether the failure to disclose significantly undermined the fairness of the verdict.

The Jencks Act imposes obligations on the government that

are distinct from the government's *Brady* obligations, but they may overlap to some extent. The Jencks Act requires the prosecution in a federal criminal case to disclose "statements" of all prosecution witnesses. The Jencks Act provides, in relevant part, as follows:

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. . . .
>
> . . . .
>
> (e) The term "statement" . . . means—
>
> (1) a written statement made by said witness and signed or otherwise adopted or approved by him; [or]
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement . . . ."

18 U.S.C. § 3500.

Under the definition in subparagraph (e), notes of a conversation are not generally Jencks Act material (unless they represent a full transcription), *Norinsberg Corp. v. U.S. Dep't of Agric.*, 47 F.3d 1224, 1228 (D.C. Cir. 1995), but a statement that is handwritten and approved by the witness is Jencks Act material. Violations of the Jencks Act are subject to harmless-error review. *See, e.g.*, *Lam Kwong-Wah*, 924 F.2d at 310.

## IV

At the outset, we find that any lost opportunity to impeach

Tequila Williams could not possibly have affected the verdicts on counts five and nine (as to which Williams did not testify). Oruche argues these convictions are tainted because of a spillover effect from the convictions on counts two and three, where Williams was a key witness. Oruche points out in this regard that the prosecution had argued against severance of these counts, claiming all the counts were part of a common scheme. The two considerations (severance and *Brady* materiality) are so different, however, that the asserted inconsistency in the government's argument disappears. It may have been quite appropriate to deny severance based on the relationship between the various counts; nevertheless, that relationship is not so great that the convictions on counts five and nine are placed in doubt simply because testimony on other counts is challenged.

Counts one, two, and three pose a somewhat more serious question. Count one is the conspiracy count, and we cannot know whether the jury based its conspiracy finding on Williams's testimony. Count two is the ITAR count arising from Oruche's New York trip, and Williams was an important witness. As to either of these counts, if the undisclosed impeachment evidence discredited Williams's testimony, perhaps the fairness of the verdict might be questioned. On count three, Oruche's argument is even stronger. Not only did Williams testify about the sale to Officer Arrington on September 21, 2000, but the impeachment evidence arguably supports Oruche's claim that Williams had another source (besides Oruche) for the heroin she sold. Thus, the resolution of this case can be divided into two issues: (1) the question of Williams's credibility in the eyes of the jury, and (2) the possibility Williams had an alternative source for heroin.

A

As regards Williams's credibility in the eyes of the jury—an issue that might impact count one, two, or three—we first consider the government's failure to disclose Detective Lyles's notes (including Williams's jottings on those notes). The notes taken by Lyles are not Jencks Act material (because they are not a full transcription of Williams's statement), *Norinsberg*, 47 F.3d at 1228-29; *see also* 18 U.S.C. § 3500(e)(2) (defining covered "statement[s]" to include only "a substantially verbatim recital of an oral statement" of a witness); *Palermo v. United States*, 360 U.S. 343, 352-53 (1959) (holding that "summaries of an oral statement which evidence substantial selection of material . . . are not to be produced" under the Jencks Act), but the few words and numbers Williams wrote on the notes *might* be Jencks Act material, assuming they qualify as "a written statement made by [Williams] and . . . approved by [her]."[1]  18

---

[1] Notwithstanding the government's repeated concession to the contrary at oral argument, we do not believe the notations satisfy the Jencks Act's definition of a "statement." The Jencks Act defines a "statement" subject to disclosure as "a written statement made by [a testifying] witness *and* signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1) (emphasis added). The government believes "[t]he notations actually written by Williams" meet this definition. Appellant's Br. at 57. Yet the notations—assuming Williams's brief written identification of "O," O's "Girlfriend (Leslie)" and their cell phone numbers constitute "statement[s]"—are not accompanied by Williams's signature or any other indication of her adoption thereof. *See* Appx. 15 at 1. The government's interpretation therefore rests on the assumption that, by merely making the notations, Williams also "signed or otherwise adopted or approved" them. 18 U.S.C. § 3500(e)(1). That interpretation, however, renders redundant the Jencks Act's requirement that a testifying witness provide both a written statement "and" a signature

(continued...)

U.S.C. § 3500(e)(1). Nevertheless, we are not persuaded the release of these notes would have enabled the defense to undermine Williams's credibility. Significantly, the notes do not suggest Williams is a liar. At most, they weakly support an argument that she had a second source for heroin, but that argument does not particularly impact her credibility. If, at trial, the defense had possessed the notes, counsel could have cross-examined Williams about the source of the heroin she sold to Arrington, and given the corroborating evidence, she likely would have denied Tungy was the source. That denial would not have undermined her credibility, because the defense lacked any strong evidence implicating Tungy as the true source, and the prosecution had plenty of evidence implicating Oruche (including cell-phone usage and video recordings showing Oruche entering the club at the critical time when the transfer of heroin took place and leaving only minutes later). Similarly, we do not see how Williams's jottings on the sheet of notes (three telephone numbers and the words "O" and "Girlfriend (Leslie)") could have been used to undermine her credibility.

We next consider the government's failure to disclose the grand jury testimony in which Williams admitted she had lied to police in 1993 to protect her boyfriend. The transcript of this

---

[1](...continued)
or other affirmation of that statement. *Id*. Because "statutory language should be construed so as to avoid redundancy," *Parker v. Califano*, 561 F.2d 320, 325 (D.C. Cir. 1977); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (courts should "avoid a reading [of statutory language] which renders some words altogether redundant"), we read 18 U.S.C. § 3500(e)(1) to require something more than the testifying witness's written notations on a sheet of paper to establish a Jencks Act "statement." Thus, in the absence of Williams's signature or some other sign of approval of the notations appearing on Detective Lyles's debriefing notes, we do not believe they are subject to disclosure under the Jencks Act.

testimony (though a full transcription) is not Jencks Act material, because it does not "relate[] to the subject matter" of Williams's testimony in the Oruche case. *Id.* § 3500(b). The grand jury transcript, however, could certainly have been used to impeach Williams's credibility. The transcript (and related notes) show that, nine years before Oruche's trial, Williams had lied to police in order to protect her boyfriend. Defense counsel could have used this evidence to support a claim that Williams was a liar who would say whatever suited her purposes in the moment, even when speaking with authority figures about a matter of grave importance. Nevertheless, given the "reasonable probability" standard articulated by the Supreme Court for *Brady* claims, *Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 682, we do not believe this evidence would have affected the outcome at trial.

Williams was thoroughly impeached at trial. The defense cross-examined her about her work in a strip club, her use of PCP, her prior felony convictions, and the benefits she was receiving in exchange for her testimony. She also admitted to the jury that she had lied in the past, and she admitted to using an alias on her plea agreement. *See Cuffie*, 80 F.3d at 518 (noting that "undisclosed impeachment evidence can be immaterial because of its cumulative nature . . . if the witness was already impeached at trial by the same kind of evidence"). Moreover, the lies Williams told in connection with the investigation of her boyfriend in 1993 were not the sort of lies that would have significantly undermined her testimony at Oruche's trial. The lies were nine years old, and in any case, a lie told to protect a boyfriend, and later recanted when under oath, is a very different thing from a lie told under oath at a criminal trial to falsely convict a defendant of heroin distribution. Finally, the evidence corroborating Williams's testimony on counts one, two, and three was very strong. As noted, count one was the conspiracy count and depended

primarily on the evidence offered in support of the other counts. As for count two, both Ogar and Williams testified about the trip to New York, and Ogar's testimony substantially corroborated Williams. In support of count three, the video recording showed Oruche entering and then exiting the club at precisely the time Williams entered the club and obtained the heroin. In sum, we think any impeachment value associated with the grand jury transcript and related notes would have been negligible and cumulative of similar evidence that was presented to the jury. We cannot say the failure to disclose this evidence called into question the fairness of the verdict. *Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 678; *see also United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996).

B

Oruche argues he could have used Detective Lyles's notes to suggest Tungy—allegedly Williams's second supplier—was the real source of the heroin Williams sold to Officer Arrington on September 21, 2000, thereby casting doubt on the count-three conviction. Here, Oruche is on weak ground. Oruche has no solid evidence tending to show Williams had any other source for heroin. The only evidence in this regard is Detective Lyles's notes, which include a very ambiguous reference to "Tungy." If, however, the government had disclosed these notes before trial, and if Oruche, on cross-examination of Williams, had attempted to implicate Tungy, Williams would likely have denied Tungy was her source, and the defense would have had nothing with which to discredit that denial. *Cf. United States v. Bowie*, 198 F.3d 905, 909-11 (D.C. Cir. 1999) (considering hypothetical impact of undisclosed evidence on cross-examination to conclude that evidence was not material). In addition, the notes are very weak support for the argument that Tungy was a heroin dealer. The word "coke" appears directly below Tungy's name, and the word "Heroin" is some distance

away and not clearly associated with the word "Tungy." Moreover, the government could have called Detective Lyles to interpret the notes, explaining Tungy was a coke dealer not a heroin dealer. Of course, Lyles testified at the *Kastigar* hearing that Tungy was a heroin dealer, but she later repudiated that testimony. If in fact she erred in testifying at the *Kastigar* hearing, then we cannot assume she would have made this same error at trial.

The district court declined to credit Lyles's claim of error, and its finding in that regard is entitled to deference, *Founding Church of Scientology*, 802 F.2d at 1457, but the district court apparently believed Detective Lyles had fraudulently prepared her second page of notes to bolster the reversal in her testimony. This conclusion is plainly wrong because Detective Lyles presented this sheet of notes at the *Kastigar* hearing, long before the change in her testimony. This oversight in the court's analysis suggests the court may have misjudged Lyles's credibility, also calling into question its analysis of the *Brady*/Jencks Act issue. If the court had credited Lyles's revised testimony that Tungy was in fact a cocaine dealer (not a heroin dealer), then the court might have been much less inclined to find that Detective Lyles's notes—with their ambiguous markings—were material exculpatory evidence.

Finally, as noted, the evidence implicating Oruche as the source of the heroin Williams sold Officer Arrington is very strong. Williams set up the deal with Arrington to occur at 3:00 p.m. at the club. Cell-phone records show a series of telephone calls between Williams and Oruche on that same day, with several calls shortly before and after 3:00 p.m. Moreover, the video recording shows Oruche entering the club minutes before the heroin sale and exiting the club minutes after the sale. This evidence strongly suggests Oruche, not Tungy, was the supplier of the heroin.

In sum, the government's failure to disclose Detective Lyles's notes and the grand jury transcript (as well as the related police notes from 1993) did not affect the outcome of Oruche's trial or call into question the fairness of the verdict, and therefore these documents were not material for purposes of *Brady*. *Kyles*, 514 U.S. at 433-34; *Bagley*, 473 U.S. at 678; *Smith*, 77 F.3d at 515. The government concedes that Williams's jottings on Detective Lyles's sheet of notes constitute Jencks Act material that should have been disclosed, but we see no possibility that disclosure of these jottings would have affected the outcome, and therefore the error (if any) was harmless, *Lam Kwong-Wah*, 924 F.2d at 310-11. The grand jury transcript and related notes were not Jencks Act material because they did not relate to Williams's testimony in the Oruche case. 18 U.S.C. § 3500(b).

V

We reverse the district court's new trial order. As noted, Oruche based his new trial motion on several asserted irregularities in the trial, but the district court's ruling focused primarily on *Brady* and the Jencks Act. The court stated: "As to other defense motions, those motions are denied in view of the grant of the new trial." The court was not specific as to the substance of the defense motions it was leaving unaddressed, but we consider it appropriate under the circumstances to remand for further proceedings consistent with this opinion.

*So ordered.*