# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 8, 2008  Decided July 17, 2009

No. 07-3092

UNITED STATES OF AMERICA,
APPELLEE

v.

CHARLES EMOR,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00064-02)

*Peter V. Taylor* argued the cause for appellant. With him on the briefs was *Danny C. Onorato*. *David Schertler* entered an appearance.

*Michael T. Ambrosino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese III* and *Elizabeth Trosman*, Assistant U.S. Attorneys.

Before: SENTELLE, *Chief Judge*, and GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the Count filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Charles Emor appeals his conviction for conspiracy to commit mail fraud on two grounds. First, that the government's failure to disclose exculpatory and impeachment evidence in a timely fashion violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500(b) (2006). Second, that the government hindered his defense by introducing evidence that the conspiracy began at an earlier date than alleged in the indictment. We affirm the judgment of the district court. There is no reasonable probability that the verdict would have been different had Emor received the undisclosed evidence, and any variance between the indictment and the evidence presented at trial did not substantially prejudice his defense.

## I.

By an indictment filed on March 7, 2006, a federal grand jury charged Emor and co-defendant Dwayne Simmons with one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, as well as several other charges that were later dismissed. According to the government's evidence, Simmons, a supervisor at the Gateway Computers shipping department in Hampton, Virginia, devised a scheme to divert the shipment of computers from legitimate customers to illegitimate buyers or, in some cases, alternative addresses for later sale. Simmons recruited Orlando Marshall and Michael Ralph to find buyers for the diverted computers, facilitate the illicit transactions, and transport the stolen property. Marshall and Ralph also enlisted the help of several other individuals, including Abdul Jalloh, to provide addresses to which the diverted computers could be shipped without arousing suspicion. Emor was the primary buyer. He purchased a large number of the diverted computers at fifty to eighty percent below the Gateway retail price, acquiring many of them for

use at a charter school he founded and reselling others to third parties. Although the indictment focused on diverted shipments and illegal transactions between late 2000 and the middle of 2002, the government's evidence at trial showed that Emor began purchasing stolen computers from Ralph and Marshall as early as 1998.

Ralph, Marshall, and Simmons each pleaded guilty to one count of conspiracy to commit mail fraud and testified as government witnesses. Although Ralph and Marshall both testified that Emor knew the computers were obtained illegally, the defense maintained that Emor legitimately purchased the computers at a discounted rate and was unaware they were stolen. After a three-day trial in December 2006, a jury found Emor guilty, and the district court imposed a sentence of twelve months in prison followed by three years of supervised release.[1]

Prior to trial, Emor filed a motion to compel production of any material in the government's possession subject to the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 154 (1972), particularly exculpatory evidence related to the co-conspirators named in the indictment. In response, the government stated that it "underst[ood] its ongoing obligations with respect to *Brady* and *Giglio*" and promised to disclose any such materials. App. at 25. Shortly before Marshall appeared as a witness, the government gave the defense several documents relating to his expected testimony, including grand jury transcripts, police reports, and his plea agreement. Two weeks after trial, however, the government

---

[1] The district court also imposed $69,000 in restitution jointly and severally on Emor, Simmons, Marshall, Ralph, and Jalloh, and granted Emor's motion to remain free on bond pending appeal.

informed Emor that it had failed to disclose audio and video recordings of a July 2002 interview the D.C. Metropolitan Police Department had conducted with Marshall. In a letter accompanying copies of these recordings, the prosecutor acknowledged that the recordings should have been turned over during the trial, explained that they were inadvertently overlooked, and asserted that Marshall's 2002 statements were consistent with the other documents disclosed prior to his trial testimony. "Out of an abundance of caution," the government also provided Emor with two investigative reports prepared by John Karr, an inspector for Gateway, which include a summary of Marshall's 2002 interview. App. at 36 (Letter from U.S. Attorney's Office to Counsel for Appellant).

Based on these post-trial disclosures, as well as a contention that the evidence at trial went beyond the timeframe set out in the indictment, Emor filed a series of motions—for declaration of a mistrial, for judgment of acquittal, and for a new trial—each of which the district court denied. In denying Emor's motion for a new trial, the court highlighted two potential discrepancies between Marshall's 2002 interview with police and his trial testimony. First, Marshall's 2002 account of a telephone conversation he had with Emor contained no reference to Emor suggesting he would lie to investigators and claim he had purchased the computers legitimately, as Marshall later testified at trial. *See* Tr. of Mot. Hr'g 34 (Mar. 20, 2007). Second, Marshall did not mention in the 2002 interview that Emor knew the computers were stolen, as he later testified at trial. *Id.* The court characterized these inconsistencies as omissions rather than lies and determined Marshall had been so thoroughly impeached during cross-examination that timely production of his 2002 interview would not have changed the outcome of the trial. *Id.* at 35–36.

In denying Emor's motion for declaration of mistrial based on the alleged variance between the indictment's timeline and the government's proof at trial, the district court noted that when Emor first objected to the introduction of evidence regarding early stages of the conspiracy, the court "reserved ruling and asked [him] to provide authority for his position." *United States v. Emor*, No. 06-0064, at 1 (Feb. 7, 2007) (Memorandum Order). Although Emor never provided any such authority, *see id.*, the court proceeded to address his renewed motion at the conclusion of trial. Framing the question as whether Emor "was prejudiced by unfair surprise as to evidence of conduct outside the charged period," *id.* at 4, the court pointed to materials turned over to the defense weeks before trial identifying the conspiracy as having begun in 1998 and concluded that Emor had not sustained his burden of showing prejudice, *see id.* at 2–5.

## II.

Emor appeals his conviction, arguing that the government's untimely disclosures violate both *Brady* and the Jencks Act, and that each violation requires a new trial. We discuss each argument in turn.

## A.

Emor contends that the government's failure to turn over recordings of Marshall's 2002 police interview constitutes a *Brady* violation and warrants a new trial. *Brady* requires the government to disclose, upon request, material evidence favorable to a criminal defendant. 373 U.S. at 87. This duty includes both exculpatory and impeachment evidence held by law enforcement officials. *See Giglio*, 405 U.S. at 154. We review de novo whether the government has breached its

obligations under *Brady*. *United States v. Oruche*, 484 F.3d 590, 596 (D.C. Cir. 2007).

There are three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The parties agree that Emor has satisfied the first two components—that is, the prosecution inadvertently suppressed impeaching evidence in the form of Marshall's 2002 police interview. *See* Br. of Appellee at 22. At issue is whether the nondisclosure resulted in prejudice to Emor.

To satisfy the prejudice component, "the withheld evidence must be 'material;' that is, there must be 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008) (quoting *Strickler*, 527 U.S. at 280). Emor argues that the withheld recordings are material because they would have assisted in impeaching Marshall at trial. The government responds that because Marshall had already been impeached, his 2002 interview could have been used only for cumulative impeachment and would not have affected the outcome.

Evidence is material if "the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict." *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) (quoting *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996)). Cumulative impeachment evidence is generally not material because the marginal effect of additional impeachment is relatively small

and unlikely to result in a different outcome. *See Oruche*, 484 F.3d at 599 (failure to disclose witness's admission she lied to police was not *Brady* violation because the witness was "thoroughly impeached" at trial). The simple "fact that other impeachment evidence was available to defense counsel," however, "does not render additional impeachment evidence immaterial." *Smith*, 77 F.3d at 515 (quoting *United States v. O'Conner*, 64 F.3d 355, 359 (8th Cir. 1995)). We have emphasized that "undisclosed impeachment evidence can be immaterial because of its cumulative nature only if the witness was already impeached at trial by the same kind of evidence." *Cuffie*, 80 F.3d at 517.

Emor identifies two primary ways in which he could have impeached Marshall with the undisclosed evidence. Armed with the July 2002 police interview, he might have sought to discredit Marshall's trial testimony that those who purchased the stolen computers "knew [they] were hot," Trial Tr. 231 (Dec. 19, 2006), with Marshall's prior, more benign suggestion to police that Emor was simply buying a large number of computers and "would get a price at a discount for purchasing in bulk," App. at 45 (Transcript of Marshall Interview). Emor might also have sought to cast doubt on Marshall's suggestion at trial that Emor effectively promised to lie to the authorities and "say he bought all these computers legitimately [and] wrote checks to [Ralph] for them," Trial Tr. 245 (Dec. 19, 2006), by pointing out that Marshall had not previously mentioned any such comment when recounting the same conversation during his 2002 interview.

As the government notes, however, Marshall's credibility was thoroughly impeached by numerous admissions that he had previously lied in attempting to cover up or minimize various aspects of the conspiracy to protect himself and other conspirators. During cross-examination, Marshall admitted to

lying under oath in a separate proceeding about the date on which he introduced Ralph to Emor. *See id.* at 253–57. Marshall also admitted to lying to inspectors when he initially said he never collected any money from Emor, when he stated that all the computers were shipped directly from Ralph to Emor, and when he suggested he knew nothing about shipments to Emor prior to 2000. *Id.* at 258, 264–65. In each instance, defense counsel impeached Marshall on the basis of inconsistent prior statements made to government inspectors in the course of their investigations. This impeachment used the same type of evidence—namely, government interview and investigation records showing Marshall initially lied about various aspects of the conspiracy—as Marshall's July 2002 interview with police investigators. Evidence Marshall lied to an investigator regarding two aspects of a conspiracy about which he was repeatedly impeached for lying to investigators does not constitute a different "kind of evidence" that would have meaningfully changed the jury's assessment of his credibility, *see Cuffie*, 80 F.3d at 518. Timely disclosure of Marshall's 2002 police interview would not have "substantially affected the efforts of defense counsel to impeach the witness," *id.* at 517, and thus the government's nondisclosure does not raise doubt about the fairness of the jury's verdict.

Nor were either of the two ways Emor identifies for using the undisclosed evidence for impeachment likely to have materially assisted his defense. Marshall's statement at trial, that Emor told him he planned to tell the authorities he "bought all these computers legitimately," Trial Tr. 245 (Dec. 19, 2006), was not itself inculpatory. Indeed, that is exactly what Emor did tell authorities and what his counsel argued at trial. Marshall did not testify that Emor *told* him he planned to *lie* about the legitimacy of the purchase. Hence, impeaching Marshall's testimony by sowing doubt that Emor had

previously said he planned to say the purchases were legitimate would not have advanced Emor's defense. Moreover, had he wished to cast doubt on Marshall's testimony that Emor indicated he would tell investigators he purchased the computers legitimately, defense counsel could have done so by referring to Marshall's interview with Postal Inspector Marydith Newman, in which he likewise made no mention of that conversation. *See* Mem. of Interview 3 (Dec. 1, 2005); *see also Smith*, 77 F.3d at 515 (suggesting we must look not only to the ways defense counsel was able to impeach a witness but also "to the ways in which the witness' testimony was allowed to stand unchallenged").

Emor suggests the July 2002 interview is also exculpatory because Marshall stated that Emor "was pretty much buying [the computers] at wholesale rate," App. at 45 (Transcript of Marshall Interview), consistent with Emor's defense that he legitimately took advantage of Ralph's employee discount and purchased the computers at below-market prices, *see* Br. of Appellant at 28–29. But the prosecution did turn over Detective Vincent Tucci's summary of the July 2002 interview before trial, which included a report of the same statement by Marshall. *See* MPD Investigative Supplement Report at 2 (July 16, 2002) ("Mr. Marshall also told investigators that Mr. Charles Emor[] . . . was purchasing systems in bulk and at a reduced price . . . ."). Emor has not shown why cross-examination using recordings of the interview would have been anything more than cumulative of the cross-examination he could have conducted using Detective Tucci's notes of that interview.

We also note, as does the government, that although Emor could have used the recordings or notes to impeach Marshall, he could not have used them as substantive evidence under the hearsay rules because the taped statement

was not "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition," FED. R. EVID. 801(d)(1)(A); *see also United States v. Livingston*, 661 F.2d 239, 242–44 (D.C. Cir. 1981) (reversible error to allow use of prior unsworn statement to a postal inspector as substantive evidence). Emor maintains that had he been able to confront Marshall with the statement during cross-examination, "Marshall may well have conceded that that was, indeed, the truth." Reply Br. of Appellant at 4. In the face of such a claim, we must inquire into "how effectively the evidence could have been used in cross-examination." *United States v. Bowie*, 198 F.3d 905, 911 (D.C. Cir. 1999).

There is little reason to suppose Marshall would have stood by his initial suggestion to police that Emor was merely purchasing computers at a legitimate wholesale rate. His trial testimony provided much circumstantial evidence that the purchases were anything but legitimate. Marshall admitted that he personally delivered the redirected computers to various secondary buyers, Trial Tr. 223 (Dec. 19, 2006), that purchasers often paid for the computers in cash, *id.* at 232, that many of the transactions took place at convenience stores and fast food restaurants, *id.* at 225, 228, that he instructed buyers not to register the computers with Gateway, *id.* at 231, that he personally oversaw repairs and technical service, *id.* at 232, and that the computers were sold for extremely low prices, *id.* Indeed, Marshall specifically admitted to knowing the computers were stolen, *id.* at 229, and explained that the purchasers "knew that the computers were hot," *id.* at 231. And even were it not contradicted by his trial testimony, Marshall's 2002 reference to a "wholesale" price, App. at 45 (Transcript of Marshall Interview), provides little direct support for Emor's defense that he was merely taking advantage of Ralph's "employee discount," *see* Trial Tr. 532–33 (Dec. 20, 2006), because the two forms of below-retail

purchasing are conceptually and practically distinct. In short, Emor failed to demonstrate that anything from Marshall's 2002 interview "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley,* 514 U.S. 419, 435 (1995).[2]

**B.**

Emor also argues that the government's failure to timely disclose Marshall's July 2002 interview violates the Jencks Act and warrants a new trial. The Jencks Act requires the government to disclose any prior "statement" made by a prosecution witness that "relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b).[3] We review de novo whether the Jencks Act applies. *United States v. Williams-Davis*, 90 F.3d 490, 512 (D.C. Cir. 1996). When a Jencks Act violation has occurred, we apply the harmless error standard to determine whether a new trial is appropriate.

---

[2] Because a defendant seeking a new trial on the basis of newly discovered evidence must show that the evidence "would *probably* produce an acquittal," *United States v. Williams*, 233 F.3d 592, 593 (D.C. Cir. 2000) (quoting *Thompson v. United States*, 188 F.2d 652, 653 (D.C. Cir. 1951) (emphasis added)), Emor's suggestion that the recent discovery of Marshall's July 2002 interview warrants a new trial even under this admittedly higher standard, *see* Br. of Appellant at 36, likewise fails.

[3] The statute defines "statement" to include "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury." 18 U.S.C. § 3500(e).

*United States v. Lam Kwong-Wah*, 924 F.2d 298, 310 (D.C. Cir. 1991).

Assuming the government's failure to disclose recordings of Marshall's 2002 police interview violated the Jencks Act, which neither party disputes, Emor is not entitled to relief because the violation was harmless. As discussed above, Marshall's 2002 statements would have assisted Emor only in further impeaching an already impeached witness. Thus, as we have already concluded in our *Brady* analysis, the government's failure to disclose the recordings did not affect the outcome of the trial. *See United States v. Carter*, 70 F.3d 146, 148 (D.C. Cir. 1995) ("If the unproduced statement could not have assisted the defense in cross-examining the witness, there is no reason for the trial court to order a mistrial or for an appellate court to reverse a conviction.").

Emor also argues the government committed a Jencks Act violation with respect to investigative reports authored by John Karr, a prosecution witness who worked as an inspector for Gateway. Only the first two pages of Karr's second investigative report relate to his testimony at trial and are thus within the scope of the Jencks Act. *Compare* App. at 60–61 (Report of July 17, 2002), *with* Trial Tr. 363–73 (Dec. 19, 2006). *See also Norinsberg Corp. v. U.S. Dep't of Agric.*, 47 F.3d 1224, 1229 (D.C. Cir. 1995) (emphasizing that the "relates to" provision of the Jencks Act includes only "the subject matter *as to which the witness has testified*" and not the "subject matter of the proceeding" generally). And Emor has not identified any information contained in these pages that conflicts with Karr's trial testimony.

Even were we to conclude that the full content of both Karr reports constitutes Jencks material, Emor has failed to show that withholding those reports was in fact harmful to his

case. For example, although he suggests that information in the Karr reports about Jalloh's involvement in the scheme would have prompted the defense to interview and obtain exculpatory material from Jalloh, Emor was aware that Jalloh pleaded guilty as a co-conspirator and received Jalloh's plea agreement documents months prior to trial. *See Norinsberg*, 47 F.3d at 1230 (finding harmless the failure to disclose Jencks material when "the [information sought] merely duplicate[s] matter already in the defendant's possession") (alterations in original); *Landry v. FDIC*, 204 F.3d 1125, 1137 (D.C. Cir. 2000) (finding harmless the failure to disclose Jencks materials that effectively "duplicate other evidence in the record"). Likewise, Emor's contention that a supposed discrepancy between the "122 computers" the investigating detective suggested were delivered to Marshall's address and the "169 packages" described in Karr's second report would have called into question "the thoroughness and good faith of the government's investigation," Br. of Appellant at 33 n.10, is unconvincing because the precise number of computers shipped to Marshall was never at issue during trial. *See Norinsberg*, 47 F.3d at 1230 (suggesting that whether such an error is harmless involves determining "whether Jencks material could have been used effectively in defense of the charge"). In short, Emor has failed to show that disclosure of the Karr reports would have affected the trial's outcome, and therefore any error in failing to produce them after his testimony on direct examination was harmless.

## III.

Finally, Emor contends that a variance between the timeline set forth in his indictment and the years for which the government presented evidence at trial resulted in substantial prejudice and requires a new trial. The first count of the indictment alleged a conspiracy "[f]rom between in or about

December, 2000, until in or about May, 2002" among Emor, Simmons, Marshall, Ralph, Jalloh, and others. App. at 2 (Indictment). In its response to Emor's request for a bill of particulars, the government asserted that "the indictment defines the defendant's role in the charged conspiracy in a manner sufficient to avoid surprise and permit the defendant to prepare a defense." App. at 26. According to Emor, the prosecution's case went beyond the bounds set by the indictment. The government, he contends, "chang[ed] its theory of prosecution" at trial "by adding a two-year period of the alleged conspiracy" during 1998 and 1999, and thereby "severely prejudiced [his] ability to meet those new allegations." Br. of Appellant at 38. Without notice of the accusations against him and others during those early years, often referred to as "Phase 1" of the conspiracy, Emor claims he was unable to gather evidence to show "that the activity attributed to him in 1998 and 1999 actually involved Mr. Jalloh, not him," Reply Br. of Appellant at 15, and "to disprove the newly alleged timeframe and the whole 'Phase 1' theory," Br. of Appellant at 38.

"A variance between the allegations of the indictment and the proof at trial constitutes grounds for reversal only if the appellant proves (1) that the evidence at trial established facts materially variant from those alleged in the indictment, and (2) that the variance caused substantial prejudice." *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988). In particular, a discrepancy between the facts alleged in an indictment and the evidence actually proffered may be cause for a new trial if the divergence prejudiced the defendant by depriving him "of notice of the details of the charge against him," *United States v. Barry*, 938 F.2d 1327, 1329 (D.C. Cir. 1991) (quoting *Gaither v. United States*, 413 F.2d 1061, 1072 (D.C. Cir. 1969)).

Emor had notice that the evidence at trial would include testimony about the early years of the scheme. Despite Emor's contention that the government "ambush[ed]" him with new information relating to the first phase of the conspiracy, Br. of Appellant at 38, materials disclosed prior to trial indicated that prosecution witnesses would identify the scheme as having begun in 1998. More than six weeks prior to trial, the government provided Emor with Simmons's plea agreement and statement of offense, which clearly identified the conspiracy as having started prior to 2000 and mentioned Emor, using his initials, as one of those to whom "many of the stolen computers went." R. Material Tab 8, Exhibit 2 at 1 (Statement of Offense for Simmons). A week before trial, the government also provided the defense with notes from a postal inspector's interview with Simmons, who indicated the conspiracy started in 1998 and said Emor provided "a lot of addresses" for the diverted computers. R. Material Tab 8, Exhibit 3 at 1–2 (Memorandum of Interview with Simmons). Indeed, the defense did not object when, during its opening statement, the government described the conspiracy as beginning "all the way back in 1998" and stated that Emor was involved in the scheme during "those first couple of years." Trial Tr. 104–05 (Dec. 18, 2006). Instead, defense counsel agreed in his own opening statement that "the evidence in this case will establish that in 1998 Dwayne Simmons and Michael Ralph agreed to steal Gateway computers," *id.* at 110, and sought to confront the Phase 1 issue by arguing that Emor "didn't know Mr. Ralph or Mr. Simmons in 1998," *id.* at 111.

Regardless of whether Emor was sufficiently apprised in advance of trial that the government believed the conspiracy began in 1998, "this is not a case where the Government's evidence allowed a defendant to be convicted of a different conspiracy or offense than that alleged in the indictment,"

*United States v. Brooks*, 524 F.3d 549, 563 (4th Cir. 2008). The indictment contained a detailed description of the alleged conspiracy, including its members, its goals, its means of operation, and a catalogue of overt acts taken in furtherance of the scheme. *See* App. at 1–5 (Indictment). The government's documentary evidence—including phone, bank, and shipping records—related to overt acts within the timeframe set out in the indictment. All critical aspects of the conspiracy remained unchanged throughout its existence, and the precise timing of the criminal scheme was not a material element either in the indictment or during trial. Moreover, the jury instruction regarding the conspiracy contained the same dates as the indictment. Trial Tr. 600 (Dec. 20, 2006) (explaining that the government was required to prove, inter alia, that "between December 2000 and May 2002, an agreement existed between two or more people to commit the crime of mail fraud . . ."). Emor has not identified a divergence between the indictment and the evidence on which his conviction was based that would have caused substantial prejudice. *Cf. United States v. Childress*, 58 F.3d 693, 709 (D.C. Cir. 1995) (concluding that a variance is grounds for reversal only if the defendant shows he was substantially prejudiced by, for example, "the spillover effect" of evidence from other conspiracies or activities to which he was not a party).

The primary issue at trial was whether Emor knew the computers he acquired were stolen. Emor has not provided any reason for us to conclude that the government's evidence with respect to the early stages of the conspiracy prejudiced his ability to assert that defense. *See, e.g.*, Trial Tr. 110–13 (Dec. 18, 2006) (defense counsel acknowledging that the conspiracy commenced in 1998 and arguing that Emor had no knowledge the computers were stolen). In fact, as the government notes, trial testimony by several cooperating witnesses regarding the initial phase of the scheme was

thoroughly impeached by earlier inconsistent statements in which each claimed the conspiracy did not start before 2000. If anything, inclusion at trial of testimony pertaining to Phase 1 of the conspiracy inured to Emor's benefit by casting some doubt on the entire testimony of these witnesses. Any variance between the timeline in his indictment and the years for which evidence was presented at trial did not result in substantial prejudice to Emor's defense.

## IV.

For the foregoing reasons, the district court's judgment is

*Affirmed.*